[Cite as *State v. Tebelman*, 2010-Ohio-481.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                   CASE NO. 12-09-01

     v.

ROBERT D. TEBELMAN,             O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Putnam County Common Pleas Court
Trial Court No. 2008 CR 62

**Judgment Affirmed**

Date of Decision: February 16, 2010


APPEARANCES:

    *Esteban R. Callejas* for Appellant

    *Todd C. Shroeder* for Appellee

Case No. 12-09-01

**SHAW, J.**

{¶1} Appellant-Defendant Robert D. Tebelman ("Tebelman") appeals from the April 13, 2009 Judgment Entry of the Common Pleas Court of Putman County, Ohio, convicting him of one count of rape in violation of R.C. 2907.02(A)(1)(b) where the victim is less than thirteen years of age and sentencing him to life imprisonment without parole.

{¶2} The facts relevant to this appeal are as follows. Tebelman and Lacy began dating in February 2006. At the time, Lacy was living in Columbus Grove with her two year old daughter, G.B. Shortly thereafter, Lacy and G.B. moved into Tebelman's apartment in Ada where he was finishing his undergraduate degree. On Christmas of 2007, Lacy asked her father, Rodney, if she, G.B., and Tebelman could move in with him to allow them to save money to get a place of their own. Rodney agreed and by March of 2008 the three were completely moved in. Rodney owned a two story house in Columbus Grove and lived on the downstairs level. Tebelman, Lacy, and G.B. occupied the three rooms on second level where Tebelman and Lacy shared one room, G.B. had her own room, and the third room, referred to as the "Junk" room, was used for storage. Although, the residents treated each level as separate apartment units, all four occupants shared the kitchen and only bathroom which were both located on the first floor.

{¶3} Tebelman took on most of the responsibility for being G.B.'s primary caretaker because Lacy had an injured back which limited her mobility, and relegated her to the upstairs level. Lacy and Tebelman split the care of G.B. accordingly. Lacy would set out G.B's clothes upstairs while Tebelman would take on the downstairs duties of cooking G.B. breakfast, fixing her hair, and making sure she bathed and brushed her teeth. In the fall of 2008, G.B. turned five and started Kindergarten at Columbus Grove Elementary. Tebelman then added escort to and from the bus stop, which was located at the end of the lane, as part of this daily routine.

{¶4} On November 4, 2008, Tebelman deviated from the routine and drove G.B to school. Lacy bought a bus ticket to travel to Grand Rapids and Tebelman needed to inform the school that G.B. would be absent for the rest of the week. When G.B. arrived at the school, she was visibly upset. She cried and complained that she did not want to be at school. According to her teacher this was unusual behavior for G.B who was a generally happy child and had never come to school crying prior to this occasion.

{¶5} A short time later, G.B. calmed and settled into the school day which progressed normally until an episode later that afternoon. G.B. asked to use the restroom and was gone for five minutes, a typical length of time for a child to be gone when using the bathroom. During this time period the school's maintenance

supervisor was walking down the hall and as he passed the restrooms he heard the stall doors slamming shut and a little girl's voice calling "Mommy, Mommy, where are you?" (*Trial Trans*. p.363). From the hallway, he asked the girl if she was alright. The door opened and G.B. exited the bathroom. The maintenance supervisor asked G.B. if she was looking for her mother and she replied "yes." He then asked if she knew where her classroom was, to which she replied "yes" and returned to her classroom to finish out the day.

{¶6} After school, Tebelman met G.B. at the bus stop. Lacy's bus left a few hours earlier. Before leaving, Lacy arranged for G.B. to stay with Kim Fletcher, G.B.'s paternal grandmother, while she was out of town. Although Lacy originally planned for Kim to pick G.B. up from the bus stop, Kim phoned Lacy to tell her that she could not pick up G.B. until 6:30 p.m. because she had to work. Lacy then relayed the change of plans to Tebelman. G.B. and Tebelman remained at the house alone for a few hours until Kim arrived. Kim picked up G.B. around 6:30 p.m. and drove her back to Delphos where Kim lived with her husband, Mark, G.B.'s grandfather.

{¶7} Kim had a meeting to attend at 7:00 p.m. so she dropped G.B. off with Mark. Kim's meeting lasted about an hour. During this time, Mark watched hunting shows on T.V. in the living room while G.B. played in the dining room, which the Fletchers made into G.B.'s playroom for when she visited. Around 7:15

p.m. Mark's friend, Ron, stopped by to visit. He left a half hour later and returned a little after eight with his wife, Peggy, and Kim who were at the meeting together. Upon Kim returning home, Mark informed her that he noticed G.B. grabbing herself in the vaginal area and suggested she look into it.

{¶8} Once Peggy and Ron left, about twenty minutes later, Kim asked G.B. if she was "hurting down there" and G.B. answered, "Yes, Grandma. I'm peeing hot pee." (*Trial Trans.* 388). Kim initially thought that G.B.'s discomfort was related to a yeast infection she had been diagnosed and treated for a month earlier. Kim took G.B. to the bathroom, located off the living room, to apply the topical vaginal cream prescribed for the yeast infection. G.B. pulled her pants down and spread her legs. Kim noticed redness from her vagina to her anus as well as a little bit of dried blood. She asked G.B. what happened. G.B. continued to complain of "hot pee." (*Id.*) Kim then asked if anyone had touched down there. G.B. did not respond and appeared embarrassed. Kim asked again. G.B. then stated "Robbie did," referring to Tebelman. (*Trial trans.* p. 389). Kim inquired further and G.B. in detail disclosed that she and Tebelman played various "games" which involved Tebelman inserting objects into her anus. She also disclosed that Tebelman inserted his fingers into her "who-who," G.B.'s name for vagina, while he bathed her.

{¶9} In shock, Kim called Chris, her son and G.B's father, to tell him what G.B. disclosed to her. Chris calmed his mother and they decided to take G.B to the hospital after work the next day. Given the emotionally charged circumstances, they thought it best at the time to let heated feelings subside before taking G.B. to the hospital. The next morning, on November 5, 2008, Kim arranged for a neighbor, Robin Priest, to come over and watch G.B. while she worked. Robin spent the day playing with G.B. At some point during the day, G.B. unprovoked mentioned that her vaginal area burned and that Tebelman hurt her. Not knowing the circumstances, Robin did not respond to G.B.'s statements and continued to watch G.B. until Kim arrived home.

{¶10} Unable to stay composed, Kim left work early and came home to gather some clothes for G.B. As they planned, she called G.B.'s father who then met her at the hospital. They arrived at St. Rita's hospital in Lima around 5:30 p.m. They were informed a few hours later that the hospital did not have anyone to perform a Sexual Assault Nurse Examination ("SANE") and directed them to the Toledo Hospital where a SANE nurse was on duty.

{¶11} After midnight on November 6, 2008 Kim, Chris, and G.B. arrived at the Toledo Hospital where Kelly Michael, a SANE nurse, examined G.B. During the examination, G.B. expressed discomfort in her vagina and stated that Tebelman hurt her. She also told the SANE nurse that Tebelman played the

porcupine game with her and inserted a book into her rectum. The examination revealed a small tear in her vagina and two lacerations on her anus. The anal lacerations and the description of the games G.B said she and Tebelman played prompted Michael to call Dr. Robert Wood to further examine G.B. Dr. Wood confirmed the SANE findings.

{¶12} On November 10, 2008, Robert Tebelman was indicted on one count rape in violation of R.C. 2907.02(A)(1)(b), a felony in the first degree, with three additional specifications: 1) G.B. was less than ten years old at the time of the offense, 2) Tebelman did purposely compel the G.B. to submit by force or threat of force, and 3) Tebelman caused serious physical harm to G.B. On March 23, 2009, the trial court found G.B. competent to testify against Tebelman. A jury trial was held on April 6, 7, 8, 2009, where several witnesses testified including G.B. At the close of the evidence, the jury found Tebelman guilty of rape and the three specifications. On April 13, 2009, the trial court sentenced Tebelman to life imprisonment with no parole pursuant to R.C. 2907.02(B).

{¶13} Tebelman now appeals, asserting four assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED WHEN IT FOUND THE ALLEGED VICTIM WAS COMPETENT TO TESTIFY IN VIOLATION OF TEBELMAN'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL PURSUANT TO EVID. R. 601(A), THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO**

THE UNITED STATES CONSITUTION, AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**ASSIGMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF INADMISSIBLE HEARSAY IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT VIOLATED TEBELMAN'S RIGHT TO DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT UPHELD THE JURY VERDICT AS IT WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. 4**

**THE TRIAL COURT FAILED TO CONSIDER THE SENTENCING STATUTES IN R.C. § 2929.11-2929.14 AND ABUSED ITS DISCRETION IN SENTENCING TEBELMAN TO THE MAXIMUM SENTENCE.**

*The First Assignment of Error*

**{¶14}** In his first assignment of error, Tebelman argues that the trial court erred in determining that G.B., who was five years old at the time of the trial, was competent to testify against him.

{¶15} As an initial matter, we note that the State, in its brief, asserts that this Court should review this issue for plain error rather than as an abuse of discretion because Tebelman failed to object to the competency finding at the trial court level. See *In re Williams* (1997), 116 Ohio App.3d 237, 241, 687 N.E.2d 507. Generally, in order to prevail under the plain error standard, an appellant must demonstrate that the outcome of his case would clearly have been different but for the error that he alleges. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043. Whereas, an abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

{¶16} The competency of a witness to testify at trial is governed by Evid. R. 601 which states in pertinent part:

> **Every person is competent to be a witness except:**
>
> **(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.**

{¶17} The Ohio Supreme Court specifically addressed the competency requirements of Evid. R. 601(A) as they relate to a child under the age of ten in *State v. Frazier* (1991), 61 Ohio St.3d 247, 250-51, 574 N.E.2d 483. The court outlined the responsibility of the trial court in determining whether a child is competent to testify:

> **It is the duty of the trial judge to conduct a voir dire examination of a child under ten years of age to determine the child's competency to testify. Such determination of competency is within the sound discretion of the trial judge. The trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them. See *State v. Wilson* (1952), 156 Ohio St. 525, 46 O.O. 437, 103 N.E.2d 552.**

*Frazier*, 61 Ohio St.3d at 250-251.

{¶18} Moreover, the court articulated five factors a trial court is to consider in determining the competency of a child under ten years of age which include:

> **(1)   the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.**

*Id.*

On March 23, 2009, the trial court held a hearing to determine whether G.B. satisfied the above standards. As prescribed by the *Frazier* Court, the trial judge conducted a voir dire examination of G.B. in which he asked her specific questions relevant to establishing her competency to testify. The following are excerpts from the competency hearing transcript as they relate to the above considerations.

Case No. 12-09-01

{¶19} G.B. testified that she understood the concepts of truth and falsity

and the consequences for telling a lie.

> Q: If somebody came in here and said right now it's raining really hard, is that a truth or a lie?
> A: Lie, lie.
> Q: You think that's a lie?
> A: (Witness nods head.)
> Q: Okay. Why do you think that's a lie?
> A: Because it's not raining right now.
> Q: Right, it's not raining, is it? I see some sun out there. And so if somebody came in here and said it's snowing really hard, is that the truth or is that a lie?
> A: A lie.

(*Trans. of Competency Hrg.*, p. 98, lines 11-24).

> Q: Okay. What would happen if somebody told you a lie, do you think, [G.B.]?
> A: They would get in trouble.
> Q: Okay. And what kind of trouble do you think would happen if you told a lie?
> A: Then you would get in trouble.
> Q: And if you told a lie to your mom, —
> A: Then I would get in trouble.
> Q: —or to your dad—let's say you told a lie to your dad or your grandpa and grandma, let's say you went home and you told a lie to your grandpa or grandma, what would happen if you told a lie?
> A: Spanking or corner or a timeout.
> Q: Timeout or a spanking or sit in the corner? You said the corner, is that, what do you mean by that?
> A: That means if you stand in the corner like that corner over there.
> Q: Okay. You think you would have to go stand in the corner?
> A: (Witness nods head.)
> Q: Okay. And so if you tell a lie, you think that might happen, that you would get into trouble?
> A: Yeah. No, if you tell a lie, you'll get in trouble.

> Q: Okay. And what happens if you tell the truth?
> A: Then if you tell the truth, that means you're really good.
> Q: If you tell the truth, that means you're going to what?
> A: Be good.

(*Id.*, p. 99, line 22-p. 101, line 6).

{¶20} G.B.'s testimony revealed that she appreciated her responsibility to be truthful at the hearing.

> Q: Okay. [G.B.], I wanted to ask you some questions about why we're here. Is that okay?
> A: (Witness nods head.)
> Q: Do you know why we're here?
> A: To talk to the truth.
> Q: To talk to the truth? Why do you think that's why we're here?
> A: Because of him. (Indicating).
> Q: Because of him? And when you're pointing and you say to "him," who are you pointing to?
> A: To Rob.

(*Trans. of Competency Hrg.*, p. 96, lines 5-15).

> Q: Why do you think it's because of him?
> A: Because he hurt.
> Q: Okay. Because he hurt you; is that what you are saying?
> A: (Witness nods head.)
> Q: All right. Let's back up a little bit, [G.B.]. Can I ask you a couple of other questions? Do you know what this room is or what this building is, what that's called.
> A: I know what this building is. It's the courtroom.
> Q: Yeah, that's right. Very good. It's called a courtroom. And do you know what a courtroom is for?
> A: To tell the truth in it.
> Q: Okay to tell the truth.
> A: Yes. If you close the doors, then other people won't hear it.
> Q: Okay. And let's talk about telling the truth. It's important here to tell the truth.

Case No. 12-09-01

**A: I know the truth.**

(*Id*., p. 96, line, 22-p.97, line 17).

**{¶21}** As to the remaining three factors, G.B. extensively demonstrated her ability to receive accurate impressions of fact and to observe acts relating to the incident about which she was to testify. Moreover, G.B. clearly showed her ability to recollect and effectively communicate those impressions and observations.

> **Q: Okay. [G.B], we're going to talk about some things today. Is that okay?**
> **A: Okay.**
> **Q: And one of the things that I'm going to ask is that you always tell the truth. Do you think you can do that?**
> **A: (Witness nods head.)**
> **Q: Can you promise that you'll do that?**
> **A: Yeah.**
> **Q: All right. And when I'm talking to you it's important that you keep your promise. Is that okay?**
> **A: Yeah**
> **Q: All right. Good. [G.B.], one of the things that we're going to be talking about is why we are here and why you've come to court today, okay?**
> **A: Okay.**
> **Q: All right. Tell me, tell me again why you think we are here?**
> **A: Because of him.**
> **Q: Okay.**
> **A: He hurt.**
> **Q: Tell me about that, [G.B.].**
> **A: He hurt me right here. (Indicating)**
> **Q: Okay. He hurt you, and how did he hurt you, [G.B.]?**
> **A: (Indicating)**
> **Q: And what does that mean?**
> **A: Fingers.**

**Q:  With his finger?**
**A:  Um-hum.  (Witness nods head.)**
**Q:  And what did he do?**
**A:  He sticked it in something.**
**Q:  Okay. And where did he, where did he put his finger?**
**A:  Right here.  (Indicating)**
**Q:  Okay.  And where is that, [G.B.].**
**A:  Right here.  (Indicating)**
**Q:  Can you tell me what that means?**
**A:  It's all the way down here.  (Indicating)**
**Q:  Okay, all the way down in like your private area?**
**A:  Yes.**
**Q:  Okay. Do you have a name for that?  What do you call that when you talk about it with people?**
**A:  Who-whos.**
**Q:  Your who-whos?  Okay.  And when you said, [G.B.], that he put his finger, can you tell me what he did?**
**A:  He put it in my who-who.**
**Q:  He put his finger in your who-who?**
**A:  Yes.**

(*Trans. of Competency Hrg.*, p. 101, line 10-p.103, line14)

**Q:  Where were you living when that happened at, [G.B.]?**
**A:  I was living with my mommy.  She was in her bedroom sleeping and I was in my bedroom and I closed the door behind Robbie.**
**Q:  [G.B.], let's go back for a minute.  When said you were living with your mommy, do you remember the house you were living at?**
**A:  Yeah, Columbus Grove house.**
**Q:  And tell me about the house.**
**A:  I lived in Columbus Grove, Ohio.**
**Q:  Columbus Grove?**
**A:  Ohio.**
**Q:  Ohio, okay.  And who lived in the same house you were living in?**
**A:  My mommy and my Robbie when he was nice.**
**Q:  Okay, your mom and Robbie.**
**A:  When Robbie was nice.**

(*Id.*, p. 104, line 4-25).

> **Q:** So let's go back, [G.B.]. You were in your bedroom, right?
> **A:** Right.
> **Q:** And Robbie came in?
> **A:** Yep.
> **Q:** And what happened after that?
> **A:** He hurted my who-who.
> **Q:** And where were you at when that happened? Where in your bedroom?
> **A:** My bedroom.
> **Q:** Where on the floor or on the bed or in a chair? Where were you at?
> **A:** I was on my computer playing some games and Robbie came in.
> **Q:** And so you were in a chair?
> **A:** Um-hum. Playing one of my games.
> **Q:** And tell me what he did.
> **A:** He hurted my who-who.

(*Id.*, p. 109, line 25-p. 110 line 16).

**{¶22}** In addition to the testimony excerpted above, G.B. demonstrated that she knew her full name, birth date, and age; the city she lived in at the time of the incident and where she resided thereafter and who she lived with in both cities including the names of the pets. G.B. clearly articulated that she was sitting in a courtroom for the sole reason to tell the truth. She described the surroundings where the incident with the defendant occurred and the manner in which he touched her and that the first person she told about the incident was her Grandma Kim.

{¶23} Tebelman contends that this testimony does not establish G.B.'s competency because she made references to porcupines, blueberry bushes, and Dora the Explorer. He argues that the trial court should have inquired whether she could discern fiction from reality. In reviewing the entire transcript, we find that these references are rare and are used only to place adult actions into a child's context. Thus, they are not pertinent enough to detract from the trial court's overall competency determination.

{¶24} G.B.'s testimony clearly established that she satisfied the standards in *Frazier* and as such we cannot find that the trial court abused its discretion. Moreover, even assuming, arguendo, that the trial court erred in finding G.B. competent to testify, we find no plain error. In addition to G.B.'s testimony, there was medical testimony introduced which corroborated G.B.'s statements admitted at trial. Thus, we find that there was substantial evidence warranting the jury to convict Tebelman of rape and therefore we cannot say that the outcome of the trial would have been different if the court had not permitted G.B. to testify at trial. In sum, the testimony elicited from G.B. at her competency hearing so clearly established her competency under the *Frazier* standards that we cannot find the trial court erred in finding her competent to testify under either standard of review. Tebelman's first assignment of error is, therefore, overruled.

*The Second Assignment of Error*

**{¶25}** In his second assignment of error, Tebelman maintains that the trial court erred in permitting the introduction of inadmissible hearsay. Specifically, Tebelman asserts that the statements G.B. made to Kim Fletcher, Robin Priest, Jess Stokeland[1] and the medical professionals constituted hearsay and were improperly admitted at trial.

**{¶26}** The State argues G.B.'s statements to Fletcher and Priest were properly admitted under the excited utterance exception to the rule against hearsay. An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2).

**{¶27}** The admission of a statement as an excited utterance under Evid.R. 803(2) is generally within the sound discretion of the trial court. *State v. Smith* (1986), 34 Ohio App.3d 180, 190-91, 517 N.E.2d 933. An appellate court will not reverse the trial court's decision absent an abuse of discretion. *State v. Brown* (1996), 112 Ohio App.3d 583, 601, 679 N.E.2d 361. Moreover, the trial court has

---

[1] In his brief, Tebelman asserts that the admission of G.B.'s statements to Jess Stokeland was improper as inadmissible hearsay. However, upon review of the record, we note that G.B. never made any statements to Jess Stokeland. In fact, Stokeland's testimony focused on the mental state of Kim Fletcher upon learning of G.B.'s alleged sexual abuse. Because Stokeland did not testify to G.B.'s statements, we will not review her testimony under this assignment of error. In addition, in his reply brief, Tebelman first makes mention of his complaint about the admissibility of Misty Bates' testimony wherein she testifies to statements G.B. made to her about Tebelman sexually abusing her. The testimony of Misty Bates was not raised in his Appellant's brief or the brief of the appellee, and so is not a proper matter presented in a reply brief filed pursuant to App.R. 16(C).

broad discretion to determine whether a declaration should be admissible as a hearsay exception. *State v. Dever* (1992), 64 Ohio St.3d 401, 410, 596 N.E.2d 436, 444. For an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) the event must be startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event. *State v. Taylor* (1993), 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316.

{¶28} The trial court initially found that statements G.B. made to Kim Fletcher were admissible as excited utterances when it overruled Tebelman's motion in limine. Kim testified that she took G.B. into the bathroom when G.B. began to complain of "peeing hot pee." Kim originally thought a yeast infection, for which G.B had previously been diagnosed and treated with a prescription cream, caused her discomfort. When Kim examined G.B.'s vaginal area to apply the topical cream, she noticed irritation and redness from G.B.'s vagina to her rectum. Kim also testified that she noticed dried blood in that area. This prompted Kim to ask G.B. what happened. G.B. continued to complain of "hot pee." Kim testified that it was when she asked G.B. if anyone had touched her "down there" that G.B.'s demeanor noticeably changed. She held her head down,

looked embarrassed, and showed a reluctance to answer that specific question. Kim asked G.B again and G.B. answered, "Robbie did." Kim asked G.B. what Tebelman did to her and in response G.B. disclosed in detail the "games" that she and Tebelman played. These games consisted of a "porcupine game" which involved Tebelman sticking a "spike" in her "bottom." She also disclosed that Tebelman put a small "book" in her "bottom." Kim testified that she asked G.B. if there was any other incident. In response, G.B. showed Kim her finger and disclosed that Tebelman put his finger in her vagina when he was giving her a bath. She further disclosed that Tebelman apologized for hurting her and she did not want to tell anyone because Tebelman had told her that if she did, he would be taken away from her.

{¶29} In analyzing whether a statement is an excited utterance, the Ohio Supreme Court noted that, "[t]he controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *State v. Humphries* (1992), 79 Ohio App.3d 589, 598, 607 N.E.2d 921. Additionally, we note that the above test has been liberally applied to out-of-court statements made by child declarants who are alleged victims of sexual abuse. *In re D.M.*, 158 Ohio App.3d 780, 793, 2004-Ohio-5858, 822 N.E.2d 433. The reason for liberalizing the scrutiny of this test is

in recognition that young children are more trustworthy than adult declarants because of their limited reflection powers. See *Taylor*, 66 Ohio St.3d at 304.

{¶30} In the instant case, G.B. clearly exhibited distress while she disclosed to Kim the circumstances surrounding the rape. G.B. experienced physical discomfort directly related to the injuries she sustained from the rape at the time she made the statements to Kim. G.B.'s initial reluctance to disclose the rape to Kim stemmed not from a motive to fabricate but from a fear that Tebelman, her primary caretaker, would be taken away from her if she told anyone what he did to her. G.B., barely five years old, demonstrated her inability to understand the serious nature of the rape and its implications by couching Tebelman's actions in terms of games they played. G.B's limited reflective powers and her inability to appreciate the ramifications of what had happened to her demonstrate the trustworthiness of her statements. See *State v. Wagner* (1986), 30 App.3d 261, 264, 508 N.E.2d 164 (stating that the limited power of reflection coupled with an inability to comprehend "the enormity or ramifications of the attack upon him sustain the trustworthiness of these communications").

{¶31} Tebelman argues, however, that the fact that G.B. made these statements in response to Kim's questions deprive them of being spontaneous and therefore exclude them as being excited utterances. In *State v. Wallace*, the Ohio Supreme Court noted the contrary:

> **[T]he admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, (3) and does not destroy the domination of the nervous excitement over the declarant's reflective facilities.**

*State v. Wallace*, 37 Ohio St.3d 87, 93, 524 N.E.2d 466.

{¶32} As noted above, at the time G.B. made the statements to Kim, she had already expressed physical discomfort from the injuries caused by the rape. It is only after Kim noticed redness and dried blood around G.B.'s vaginal and rectum areas that she asked G.B. what happened. Kim's questioning of G.B. simply served to facilitate G.B.'s expression rather than to cause reflection.

{¶33} G.B. made similar disclosures to Robin Priest the next day. Kim asked Robin to babysit G.B. while she went to work. Robin testified that she and G.B. were at the park when G.B. exhibited discomfort in her genital region and unprompted, stated that she hurt and it burned and that Robbie did it. Robin testified that she did not comment on G.B.'s statement and that the conversation ended. G.B. experienced the same physical burning and discomfort she had when she made the initial disclosures to Kim. Clearly, G.B. was still under the stress of excitement when she made these comments to Robin.

{¶34} Furthermore, even if G.B.'s statements to Kim and Robin did not qualify as excited utterances, the admission of this evidence constituted harmless error. G.B.'s testimony describing the sexual abuse by Tebelman, in conjunction

with the medical testimony corroborating that G.B. sustained injuries consistent with the described abuse, could have sustained a guilty verdict absent any improper admission these statements.

**{¶35}** Tebelman also summarily asserts that the trial court erred by admitting the statements G.B. made to "medical professionals." In total, five medical professionals testified at trial, four on behalf of the State and one for the defense. Dr. Megan McGraw, a witness for the State, conducted a follow up examination of G.B. McGraw performed a physical examination and did not re-interview G.B. Thus, she did not testify to any statements G.B. made to her. The remaining medical professionals who testified to statements made by G.B. were Kelly Michael, Dr. Robert Wood, Dr. Randall Schlievert, and Diane Gable.

**{¶36}** The State argues that the statements G.B. made to these witnesses were properly admitted under Evid. R. 803(4) which states in part:

> **Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.**

**{¶37}** When analyzing the admissibility of a statement under this exception to the hearsay rule, the primary inquiry is whether the statements were made for purpose of diagnosis and treatment rather than for some other purpose. The trial court's consideration of the purpose of these statements depends on the facts of a

particular case. This is especially true when assessing a child's statements made to medical professionals. The trial court should consider factors such as the child's age, the child's motive to fabricate, the consistency of the child's declarations, and whether the child appreciated the need to be truthful to medical personnel.[2] See *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944. Additionally, the trial court should consider the manner in which the medical professional elicited a disclosure of abuse from the child. *Id.* We address each of the medical professionals in turn.

{¶38} When G.B. arrived at the Toledo Hospital on November 6, 2008, Kelly Michael, a SANE nurse, was the first to examine her. Michael testified that she worked at the hospital for nine years and in that time performed approximately 80 adult and 50 child SANE cases. Michael testified that G.B. was aware she was in a hospital because she was "sick" and she understood that Michael, as a nurse, was there to help her. Michael asked G.B. where she hurt. G.B. answered, "my who-who" and pointed to her vaginal area. Michael then asked G.B. why it hurt. G.B. replied stating that Tebelman played a porcupine game with her. Michael testified that she does not like to interrupt the patient, whether a child or an adult, so she permitted G.B. to continue to talk about the porcupine game. G.B. described the game as one involving a stick, blueberries, a flower and a leaf and

---

[2] It should be noted that statements made to a social worker or therapist may also be admitted under this rule if found to have been made for purpose of diagnosis or treatment. *Muttart*, 116 Ohio St.3d at 15.

stated that Tebelman stuck the leaf up her "who-who." Michael further testified that she examined G.B.'s vagina and rectum. As Michael examined G.B.'s rectum, G.B. told her that Robbie had put a book inside her "butt" and she pointed to where he touched her.

{¶39} G.B.'s disclosure about the games she and Tebelman played and the injuries to G.B.'s vagina and anus prompted Michael to ask Dr. Wood, the Emergency Room doctor on duty, to examine G.B. Dr. Wood testified that he introduced himself to G.B. and asked if she was feeling any discomfort and how her injuries occurred. Dr. Wood testified that G.B. told him the injuries occurred from her mother's boyfriend.

{¶40} Diane Gable also testified on behalf of the State. As a licensed social worker, Gable testified that she engaged in play therapy with G.B. to assist her in coping with her abuse. Gable testified that she explained to G.B. her role as a counselor and G.B. acknowledged that her father wanted her to see Gable "to get better." During the therapy sessions, G.B. made disclosures to Gable about the abuse. In one such instance, Gable testified that she worked with G.B. to distinguish between safe and unsafe touching and used a picture of a girl in a swimsuit as a demonstrative aid. Gable testified that G.B. pointed to the area between the girl's legs and stated that Tebelman touched her "who-who" with a porcupine. Gable further testified that when G.B. discussed the abuse she

oscillated between stating that Tebelman used a porcupine and his finger. Gable testified that throughout the several therapy sessions she conducted, G.B. consistently indentified Tebelman as the perpetrator and continued to state that he put his finger in her who-who and that they played the porcupine game in which he inappropriately touched her "butt."

{¶41} Dr. Schlievert testified for the defense. He performed a follow up examination of G.B. to assess her physical injuries and also stated that he did not re-interview G.B. Like Dr. Wood, his conversation with G.B. was limited to introductions and asking her if she understood why she was at his office. Dr. Schlievert testified that G.B. did not disclose any statements about the abuse. He testified that G.B. was conversational until he asked her if anything happened to her "butt." He testified that G.B. became very emotional and yelled "no" and then stated that "I don't live with Robbie any more because I don't like him." Dr. Schlievert further testified that he did not conduct any type of interview because G.B.'s emotional state was not conducive to participate in a discussion.

{¶42} In reviewing the record it is clear that the primary purpose for the medical professionals' interaction with G.B. was to provide medical treatment. In each of these instances the trial court properly admitted G.B.'s statements as an exception to the hearsay rule under Evid.R. 803(4). There is no indication that any of the medical professionals solicited G.B.'s disclosures in a leading manner. In

most cases, G.B. voluntarily disclosed the details of the abuse. There was no indication G.B. had a motive to fabricate her statements. At the time G.B. made these statements, she understood that she was receiving some type of assistance to make her "better." Additionally, G.B. consistently told the same version of events to each medical professional over a six month period. All of these factors are indicia of reliability that demonstrate the trial court did not abuse its discretion in finding G.B.'s statements were made for the purposes of medical diagnosis and treatment. Tebelman's second assignment of error is therefore overruled.

*The Third Assignment of Error*

{¶43} In his third assignment of error, Tebelman argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶44} In the former, the court must determine whether the evidence submitted is legally sufficient to support all of the elements of the offense charged. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386-87, 678 N.E.2d 541. In the latter, the appeals court acts as a "thirteenth juror" to determine whether the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. *Id*. at 387. Specifically, we must determine whether the State has presented evidence which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable

doubt. The test is, viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* at 390; *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, 574 N.E.2d 492. See also, *State v. Eley* (1978), 56 Ohio St.2d 169, 383 N.E.2d 132; *State v. Barns* (1986), 25 Ohio St.3d 203, 492 N.E.2d 192.

{¶45} Tebelman was convicted of one count of rape in violation of R.C. 2907.02(A)(1)(b). The relevant elements are as follows:

> **No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:**
> **\* \* \***
> **[T]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person.**

In addition to the elements above, the prosecution had to prove the following three specifications. G.B. was under ten years of age, Tebelman compelled her to submit by force or threat of force, and Tebelman caused G.B. to suffer serious physical harm.

{¶46} Several facts emerge from the record which are undisputed on appeal. G.B. had just turned five years old when the incident occurred, and was thereby well under ten years of age. Tebelman and G.B had a very close relationship. Tebelman lived with G.B. and her mother for two and a half years

and they all lived together in Columbus Grove at the time the incident occurred. Tebelman testified that he played a large role as G.B.'s caretaker. Although G.B. never referred to Tebelman as a father figure, by all accounts G.B. adored him affectionately calling him her Robbie.

{¶47} The medical testimony from both the State and the defense witnesses was overwhelmingly indicative of anal rape. Pictures of G.B.'s injuries were admitted at trial showing two lacerations on her anus. Dr. Schlievert, a witness for the defense, testified that had those injuries been inflicted on any other part of the body, such as the arm, leg, or face, they would have required stitches. In addition, G.B. independently complained of pain and discomfort in her genital area over a three day period, from November 4 to November 6, 2008, to Kim and Mark Fletcher, Robin Priest and Kelly Michael. Michael testified that, during the SANE examination, G.B. pointed to her rectum where she claimed Robbie touched her and where the lacerations were also present. Michael testified that this area was still very tender and continued to cause G.B. to experience pain. Furthermore, Dr. McGraw conducted a follow up examination of G.B. on November 19, 2008, and testified that one of the lacerations on G.B.'s anus remained significant and noticeably deeper than a superficial tear despite the passing of a two week period. Dr. McGraw also testified the area where the laceration was located was still "very tender" to the touch when she examined G.B.

{¶48} In sum, the testimony of these witnesses demonstrated that the injuries to five-year old G.B. were significant and that she suffered prolonged pain over a period of at least two weeks. Accordingly, in our view, there is no question that the evidence was sufficient to establish that G.B.'s injuries constituted serious physical harm.

{¶49} On appeal, the only issue Tebelman contests is whether the prosecution offered sufficient evidence to identify and convict him as the perpetrator. The majority of Tebelman's argument hinges on trial court's determination of G.B.'s competency to testify and the admissibility of G.B.'s statements to people around her and medical professionals as to his identity. Tebelman asserts that there were many people with the opportunity to commit the rape. On the other hand, in G.B.'s testimony and in the numerous times she retold the story to other witnesses, Tebelman was consistently identified as the person who raped her.

{¶50} Thus, after viewing all the evidence in a light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Tebelman committed the offense of rape. Moreover, given the overwhelming evidence presented at trial in support of a guilty verdict, this Court cannot find that the jury lost its way in convicting Tebelman of this offense. Accordingly, Tebelman's third assignment of error is overruled.

*The Fourth Assignment of Error*

**{¶51}** In his final assignment of error, Tebelman argues that the trial court abused its discretion because it failed to consider the sentencing statutes in R.C. 2929.11-2929.14 when it sentenced Tebelman to the maximum sentence, life imprisonment with no parole.

**{¶52}** Trial courts have full discretion to impose a prison sentence within the statutory range. *State v. Mathis*, 109 Ohio St.3d 54, 62, 846, 2006-Ohio-855, N.E.2d 1. Although a trial court is no longer required to make findings or give their reasons for imposing a maximum sentence, it is still required to consider the principles of sentencing set forth in R.C. 2929.11. However, as this Court has noted, "the trial court is not required to discuss the factors on the record or even to state on the record that it has considered the statutory language." *State v. Scott*, 2008-Ohio-86, ¶ 49.

**{¶53}** R.C. 2907.02(B) provides that if the offender during or immediately after the commission of the offense caused serious physical harm to the victim *or* if the victim is under the age of ten, the offender is subject to life imprisonment without parole. The sentencing judge is therefore permitted to sentence Tebelman to life without parole upon finding either that the child was under the age of ten at the time of the offense or that the victim suffered serious physical harm as a result of the offense. In this case, the sentencing judge and the jury found both factors

present.[3]  As such, by acting clearly within its statutory authority, the trial court did not abuse its discretion in sentencing Tebelman to life imprisonment with no parole.  Tebelman fourth assignment of error is overruled.

{¶54} Based on the foregoing, the April 13, 2009 Judgment of the Court of Common Pleas of Putnam County, Ohio sentencing Tebelman to life imprisonment without parole for his conviction for rape is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., concurs.**

**/jlr**

**ROGERS, J., concurring separately.**

{¶54} While I concur with the result reached by the majority, I feel it necessary to make two observations.

{¶55} First, the hearsay exceptions defined in Evid.R. 803(4) are limited to statements made for the purpose of *medical* diagnosis or treatment.  The original theory and purpose of the exception contained in Evid.R. 803(4) were to promote accurate diagnosis and treatment of physical injuries and/or disease by physicians.

---

[3] Both the jury and the judge found Tebelman guilty of all three specifications including that Tebelman compelled G.B to submit by force or threat of force, in addition to G.B. being under the age of ten and Tebelman causing her serious physical harm.

Nowhere in this portion of Evid.R. 803(4) is there an exception included for social workers or therapists. Unless and until the proper method of amendment to the Rules of Evidence has been followed, this Court and the Ohio Supreme Court should avoid any attempt to include such persons or professions within the stated exception. If an extension of the rule is desired, let it proceed in the required manner for amendments to the Rules of Evidence.

{¶56} It appears that some of the discussion between licensed social worker Diane Gable and G.B. was simply sex education, but it led to statements about the abuse which the majority accepts as proper exception under Evid.R. 803(4). Although I think that these statements provided to the social worker should have been excluded in this case, I find any such error to be harmless due to the amount of properly admitted evidence.

{¶57} Second, the majority opinion takes the term "serious physical harm" too lightly.

{¶58} R.C. 2901.01(A) contains the following definition for serious physical harm.

> **(5) "Serious physical harm to persons" means any of the following:**
> **(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;**
> **(b) Any physical harm that carries a substantial risk of death;**

**(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**
**(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;**
(e) **Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain**.

R.C. 2901.01(A)(5)(a)-(e).

{¶59} Only R.C. 2901.01(A)(5)(e) could possibly apply in this case. Although the majority discusses lacerations, and pain and discomfort that may have lasted for two weeks, I do not find that these constitute serious physical harm as defined by the statute.

{¶60} However, R.C. 2907.02(B) provides that, when the victim is less then ten years of age, the trial court may impose a sentence of life imprisonment without parole. Therefore, I find no error in the sentence imposed in this case.

**/jlr**