[Cite as *State v. Tebelman*, 2023-Ohio-882.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 12-22-04

      v.

ROBERT D. TEBELMAN,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2008 CR 00062

Judgment Affirmed

Date of Decision: March 20, 2023

APPEARANCES:

    *Kimberly Kendall Corral and Katerina Bravos MacGregor*
        **for Appellant**

    *Todd C. Schroeder* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant Robert D. Tebelman ("Tebelman") appeals the judgment of the Putnam County Court of Common Pleas, raising various arguments that challenge the trial court's decision to deny his motion for a new trial. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} G.B. lived in a house with her mother, Lacy Niese ("Lacy") and her mother's boyfriend, Tebelman. Doc. 235, Ex. G, Tr. 645, 654, 668. On November 4, 2008, when G.B. was five years old, her mother went on a trip to Michigan and had planned to be gone for several days. *Id*. at 658, 675. Since her mother was gone, Tebelman was waiting for G.B. when she got off of the school bus at roughly 3:45 P.M. *Id*. at 677. G.B.'s grandmother, Kim Fletcher ("Kim"), was supposed to pick G.B. up after school because she was going to watch her while Lacy was in Michigan. *Id*. at 662. However, Kim called Lacy, indicating that she would not be able to pick up G.B. until 6:30 P.M. Doc. 235, Ex. B, Tr. 385. Lacy then communicated this information to Tebelman. Doc. 235, Ex. G, Tr. 662.

{¶3} Tebelman and G.B. were then alone together for several hours until Kim picked G.B. up at roughly 6:30 P.M. Doc. 235, Ex. B, Tr. 386-387. Kim then drove to her house in Delphos and left G.B. with her grandfather, Mark Fletcher ("Mark"). *Id*. at 386. Kim then went to a meeting that lasted roughly an hour. *Id*. While Kim

was gone, a family friend came and visited with Mark. *Id.* During this time, Mark noticed that G.B. "kept grabbing herself." *Id.* at 387. After Kim had arrived at home and the family friend had departed, Mark suggested that Kim examine what was causing G.B.'s discomfort. *Id.*

**{¶4}** When asked, G.B. indicated that the area around her private was hurting. Doc. 235, Ex. B, Tr. 388. Kim initially thought that this might have been related to a yeast infection that G.B. had roughly a month prior that that time, but when she examined G.B.'s private areas, she observed redness that extended from her vagina to her anus alongside dried blood. *Id.* Kim then asked G.B. if anyone had touched that area of her body. *Id.* at 389. G.B. was initially hesitant to respond but eventually reported that Tebelman had penetrated her with his fingers and a book while he was giving her a bath. *Id.* at 389-390. G.B. stated that these actions had hurt. *Id.* at 390. She also reported that Tebelman did not use a washcloth to bathe her but used his hands to put the soap all over her body and inserted his fingers inside of her. *Id.* at 390. Doc. 235, Ex. A, Tr. 6.

**{¶5}** G.B. also told Kim that Tebelman had said that "he didn't mean to hurt [her]" and that, "if [she] * * * told that they would take him away." Doc. 235, Ex. B, Tr. 391. She then said, "But don't say nothing because I don't want Robbie to get in trouble * * *." *Id.* However, she also said, "I just don't want him to hurt me no more." *Id.* Kim took G.B. to the Toledo Hospital the next day where G.B.

underwent a medical examination performed by a Sexual Assault Nurse Examiner ("SANE Nurse"). *Id.* at 395, 397. This examination revealed that G.B. had a vaginal laceration and two anal lacerations. Doc. 235, Ex. C, Tr. 309. Doc. 325, Ex. D, Tr. 324, 334. The SANE nurse called Dr. Robert F. Wood ("Dr. Wood") to observe these injuries and confirm her findings. Doc. 325, Ex. C, Tr. 308. During this examination, G.B. again identified Tebelman as the person who had hurt her in these areas and further indicated that Tebelman had inserted a book into her rectum. Doc. 235, Ex. B, Tr. 398.

{¶6} On November 19, 2008, G.B. had a follow up appointment with Dr. Megan L. McGraw ("Dr. McGraw"), who has special training in the area of child abuse and neglect. Doc. 235, Ex. D, Tr. 319, 321. Dr. McGraw examined the affected areas of G.B.'s body and obtained a history of the situation. *Id.* at 325. By this point, the injuries had made progress towards healing. *Id.* at 327. However, Dr. McGraw was also able to review the medical information that had been collected previously. *Id.* at 326-327, 333-334.

{¶7} On December 15, 2008, Tebelman was charged with one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, with specifications that alleged the victim was under ten years old at the time of the offense; that Tebelman compelled the victim to submit by force or threat of force;

and that he caused serious physical harm to the victim. Doc. 1. The victim, G.B., was roughly five years old at the time of the alleged offense. Doc. 1, 235.

{¶8} The trial court found that G.B. was competent to testify. Doc. 235. Accordingly, G.B.'s testimony was offered at Tebelman's jury trial in April of 2009. Doc. 235, Ex. A. Kim and Tebelman also provided testimony about the events of November 4, 2008. Doc. 235, Ex. B, Ex. G. The State called Dr. Wood and Dr. McGraw to testify as experts regarding the medical evidence that had been collected during the medical examinations of G.B.'s injuries. Doc. 235, Ex. C, Tr. 306. Doc. 235, Ex. D, Tr. 318. The Defense then called Dr. Randall S. Schlievert ("Dr. Schlievert") to provide expert testimony regarding this medical evidence. Doc. 235, Ex. E, Tr. 622.

{¶9} Dr. Wood affirmed that the anal lacerations observed in G.B.'s body were indications "that she suffered blunt forced [sic] trauma to her anal region as the result of penetration[.]" Doc. 235, Ex. C, Tr. 311. Dr. McGraw testified that she "believed that [G.B.] * * * had had significant trauma to her anal area, including penetration." Doc. 235, Ex. D, Tr. 327. Dr. Schlievert testified that the injuries to G.B.'s body were consistent with her statement. Doc. 235, Ex. E, Tr. 635. He had concluded that the injuries to G.B.'s vaginal area were "not diagnostic of sexual abuse," meaning that the injuries were not "ironclad proof" of sexual abuse "with

no other cause." *Id.* Dr. Schlievert then affirmed that the injuries to the anal region of G.B.'s body were "a hundred percent indicative of anal rape[.]" *Id.* at 636.

{¶10} After hearing the evidence presented by the State and the Defense, the jurors returned a verdict of guilty on the charge against Tebelman. Doc. 235. He then filed his direct appeal, raising four assignments of error to challenge his conviction. Doc. 235. One of these assignments of error challenged the trial court's decision that found G.B. competent to testify as a five-year-old. *State v. Tebelman*, 3d Dist. Putnam No. 12-09-01, 2010-Ohio-481, ¶ 13. On February 16, 2010, this Court released a decision that affirmed his conviction. *Id.* at ¶ 54.

{¶11} On October 21, 2021, Tebelman filed a motion that requested leave to file a motion for a new trial and a hearing on the matters presented therein. Doc. 180. His motion purported that G.B. had recanted the allegations that she had raised against Tebelman in 2008. Doc. 180. On November 10, 2021, the trial court granted Tebelman leave "so that [he could] * * * be heard as to the motion for a new trial." on November 10, 2021. Doc. 181. Hearings on this motion were then held on December 22, 2021 and February 15, 2022. Doc. 235.

{¶12} Roughly two months after she had turned eighteen, G.B. testified at the hearing held on December 22, 2021. Tr. 13. She said, "I do not believe this man [Tebelman] is capable of touching a child, whether it was then or now. I cannot

Case No. 12-22-04

imagine it, nor can I see it happening ever." Tr. 34. On cross-examination, the

following exchange occurred:

> **[Prosecutor:] In November of 2008, did you have injuries to your anus that was due to physical trauma from forced penetration?**
>
> **[G.B.:] No.**
>
> **[Prosecutor:] Why do you think that you did not?**
>
> **[G.B.:] If—I feel like if I was violated in such a manner it would stick with me. I would remember it every single day. Because that is something what happens to a sexual assault victim.**
>
> **\* \* \***
>
> **[Prosecutor:] \* \* \* But as I understand your testimony, your testifying today that you never had injuries to your anus due to a rape event because you don't remember it; is that fair?**
>
> **[G.B.:] Fair.**
>
> **[Prosecutor:] But you have asked to look at the evidence in this case, but your mother wouldn't let you see it; true?**
>
> **[G.B.:] True.**

Tr. 50-52. She also stated that she could not remember whether she had been alone

with Tebelman on November 4, 2008. Tr. 71-72, 74, 155. Further, as she had not

been permitted to review the evidence that had been produced at Tebelman's trial,

G.B. also testified that she was unaware of the results of her medical examinations,

the kinds of injuries she had sustained to her body, or the conclusions that had been

reached by the medical experts. Tr. 54-55, 61, 65-66.

{¶13} On March 11, 2022, the trial court released a nineteen-page judgment entry that had seven attached exhibits. Doc. 235, Ex. A-G. These exhibits consisted of portions of the transcripts from Tebelman's trial, including the testimony of G.B., Dr. Wood, Dr. McGraw, Dr. Schlievert, Kim, and Tebelman. Doc. 235, Ex. A-G. The trial court ultimately denied Tebelman's motion for a new trial. Doc. 235.

{¶14} Tebelman filed his notice of appeal on March 24, 2022. Doc. 239. On appeal, he raises the following nine assignments of error:

**First Assignment of Error**

**The trial court abused its discretion when it applied an arbitrary legal standard not adopted by this appellate district.**

**Second Assignment of Error**

**The trial court abused its discretion when it failed to weigh the materiality of evidence presented.**

**Third Assignment of Error**

**The trial court abused its discretion when it framed the legal standard as a question, as it is unconscionable to deny post conviction relief while the court's judgment evidence its unresolved questions about the appropriate legal standard.**

**Fourth Assignment of Error**

**The trial court's assessment of GB's testimony is the result of an unsound reasoning process and constitutes an abuse of discretion.**

**Fifth Assignment of Error**

**The court abused its discretion when it failed to consider the expert testimony of Linda Ellerbrock, apparently giving it no**

**weight at all, though her expertise was by motion of the State, established by the court and not in dispute by the parties.**

### Sixth Assignment of Error

**The trial court abused its discretion when it arbitrarily gave dispositive weight to trial testimony which relied on the now recanted statements of G.B., without considering the effect of the recantation on reliability.**

### Seventh Assignment of Error

**The trial court erred when it permitted the State to engage in misconduct designed to intimidate the witness over objection of the Defense.**

### Eighth Assignment of Error

**The trial court abused its discretion when it concluded that, if GB was raped, Robert Tebelman was the only person with access to G.B.**

### Ninth Assignment of Error

**The trial court's reasoning, that it is in a better position to determine what happened to a woman's body than the woman who lives in that body, is so unconscionable that it constitutes an abuse of discretion.**

*First Assignment of Error*

{¶15} Tebelman argues that the trial court applied the incorrect legal standard in deciding whether to grant his motion for a new trial.

Case No. 12-22-04

**{¶16}** "Motions for a new trial are governed by Ohio Crim. R. 33." *State v. Antony*, 3d Hardin No. 6-07-23, 2008-Ohio-1998, ¶ 7. Crim.R. 33(A) reads, in its relevant part, as follows:

> **(A)     Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights:**
>
> **(6)    When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given[.] * * ***

Crim.R. 33(A)(6). Thus, "a trial court may grant a motion for new trial based on the discovery of new evidence material to the defense that the defendant could not, with reasonable diligence, have discovered and produced at trial." *State v. Brodbeck*, 10th Dist. Franklin No. 17AP-61, 2017-Ohio-7187, ¶ 10.

> **In order to warrant the granting of a motion for new trial in a criminal case based on grounds of newly discovered evidence, a defendant must show that the new evidence: '(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'**

-10-

*State v. Graggs*, 10th Dist. Franklin No. 22AP-170, 2022-Ohio-3407, ¶ 32, quoting

*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

> '**While [*State v. Petro, supra*] stands for the proposition that newly discovered evidence that merely impeaches or contradicts other evidence is not enough for a new trial, we do not read *Petro* as establishing a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result.**'

(Citations omitted.) *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 19, quoting *City of Dayton v. Martin*, 43 Ohio App.3d 87, 539 N.E.2d 646, at syllabus (2d Dist. 1987).

{¶17} "A witness's recantation of testimony can be newly discovered evidence * * *." *State v. T.S.*, 10th Dist. Franklin No. 20AP-159, 2021-Ohio-2203, ¶ 35, quoting *State v. Woodward*, 10th Dist. Franklin No. 08AP-1015, 2009-Ohio-4213, ¶ 35. However,

> "**newly discovered evidence which purportedly recants testimony given at trial is 'looked upon with the utmost suspicion[,]'" * * *[. Accordingly,] the trial court ha[s] discretion in according the weight such evidence was to be given.**

*State v. Dukes*, 10th Dist. Franklin No. 96APA03-333, 1996 WL 697955, *3 (Dec. 3, 1996), quoting *State v. Brooks*, 8th Dist. Cuyahoga No. 65088, 1994 WL 77738, *6 (Mar. 10, 1994), quoting *State v. Germany*, 8th Dist. Cuyahoga No. 63568, 1993

WL 389577, *6 (Sept. 30, 1993). *See also In re Shad,* 1st Dist. Hamilton Nos. C-080965, C-081174, 2009-Ohio-3611, ¶ 11; *State v. Rossi*, 2d Dist. Montgomery No. 24740, 2012-Ohio-2545, ¶ 17; *State v. Moore*, 7th Dist. Mahoning No. 13 MA 9, 2014-Ohio-358, ¶ 25.

{¶18} "An appellate court reviews a trial court's determination of a motion for a new trial based on newly discovered evidence under an abuse of discretion standard." *State v. Turks*, 3d Dist. Allen Nos. 1-10-02, 1-10-26, 2010-Ohio-5944, ¶ 34. "Whether the trial court abused its discretion is determined by a review of the record in light of the six-factor test for materiality derived from *Petro*, *supra*." *State v. Yasin*, 10th Dist. Franklin No. 90AP-535, 1991 WL 224939, *3 (Aug. 22, 1991). "[A]n abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious." *State v. Kleman*, 3d Dist. Hardin No. 6-19-01, 2019-Ohio-4404, ¶ 8.

Legal Analysis

{¶19} Tebelman argues that the trial court did not apply the legal standard set forth in *State v. Petro*, *supra*, to the facts of this case. He asserts that the trial court erred by instead applying the legal standard set forth in the Sixth District Court of Appeals' decision in *State v. Jordan*, 6th Dist. Lucas No. L-18-1147, 2019-Ohio-2647, ¶ 39. Tebelman then asserts that the trial court should not base its judgments on persuasive authority from the Sixth District.

**{¶20}** However, in its judgment entry, the trial court quotes the applicable legal standard from *Petro*. Doc. 235. Further, the trial court's analysis contains considerations that indicate that the trial court examined multiple factors from the *Petro* test. Doc. 235. But notably, the trial court stated that:

> **[a]s the parties have agreed, this issue would focus on the victim, the testimony of the victim at the original trial, the victim's current testimony *and how those would affect the outcome of this case.***

(Emphasis added.) Doc. 235. Based on this text, the parties appear to have agreed that this factor merited special attention in this case. The trial court engaged in an extensive analysis of whether G.B.'s December 2021 testimony was credible and, therefore, had the potential to be outcome determinative. Thus, the judgment entry indicates that the trial court applied the standard set forth in *Petro*.

**{¶21}** In this case, the trial court did cite to the Sixth District's decision in *Jordan* because that case specifically addressed how to evaluate a witness's purported recantation of prior testimony. *Jordan, supra*, citing *Toledo v. Easterling*, 26 Ohio App.3d 59, 498 N.E.2d 198 (6th Dist. 1985), paragraph three of the syllabus. The trial court relied on *Jordan* for the following legal standard:

> **A two-step analysis is applied to cases where significant witnesses recant their trial testimony. *Toledo v. Easterling*, 26 Ohio App.3d 59, 498 N.E.2d 198 (6th Dist.1985), paragraph three of the syllabus. First, the trial court must determine which version of the contradictory testimony offered by the recanting witness is credible and true, and whether the recanted testimony is to be believed. * * * Second, the trial court must evaluate whether the**

> **witness's testimony could have affected the outcome of the trial.**
> ***Easterling* at paragraph three of the syllabus.**

*Jordan* at ¶ 39. This two-step analysis was set forth just after the Sixth District had quoted the legal standard from *Petro*. *Id*. at ¶ 37. Thus, this two-step analysis does not replace the *Petro* standard but is used in the process of applying the *Petro* standard in a case with a purported recantation.

{¶22} Further, *Jordan* draws the standard for evaluating recantations from *Toledo v. Easterling, supra,* at paragraph three of the syllabus. While this Court has not specifically cited to the *Jordan* case, we have relied on the same standard for evaluating recantations as set forth in *Easterling*. *State v. Turner*, 3d Dist. Logan No. 8-87-17, 1989 WL 153603, *5 (Dec. 21, 1989), citing *Easterling*; *State v. Howard*, 3d Dist. Marion No. 9-91-34, 1991 WL 240043, *1 (Nov. 18, 1991), citing *Easterling*. Thus, we conclude that the trial court did not err in relying on *Jordan* as it applied the legal standard set forth in *Petro* to the facts of the case presently before this Court. In fact, we will rely on the legal standard derived from *Easterling*, *supra*, to address several subsequent assignments of error in this appeal.

{¶23} In conclusion, there is no indication that the trial court failed to apply the correct legal standard in deciding this case. In its judgment entry, the trial court quoted and applied the legal standard set forth in *Petro*. Doc. 235. The trial court's reliance on *Jordan* does not negate the fact that it applied the legal standard from *Petro*. Thus, having examined the contents of the trial court's judgment entry, we

conclude that Tebelman has not demonstrated that the trial court erred by using the incorrect legal standard in this case.[1]  His first assignment of error is overruled.

*Second Assignment of Error*

**{¶24}** Tebelman argues that the trial court erred by failing to make a finding as to the materiality of G.B.'s testimony at the December 2021 hearing.

Legal Standard

**{¶25}** We herein reincorporate the legal standard that was set forth under the first assignment of error.

Legal Analysis

**{¶26}** In this assignment of error, Tebelman argues that the trial court failed to evaluate the materiality of G.B.'s December 2021 testimony.  The two-step analysis for recantation testimony is as follows:

> **In determining whether to grant a new trial on the basis of recanted testimony, the trial court must make two findings: (1) which of the contradictory testimonies of the recanting witness is true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?**

*Turner*, *supra*, at *5, citing *Easterling*, *supra*, at third paragraph of the syllabus.

The second prong of the two-step analysis for recantation testimony and the fourth

---

[1] In this assignment of error, Tebelman also argues that the trial court failed to make a finding under both of the prongs of the test in *Jordan*, as derived from *Easterling*, in its judgment entry.  Appellant's Brief, 10. This is also the subject of Tebelman's second assignment of error.  For this reason, we will address whether the trial court was required to make both findings and whether the trial court failed to make both findings under the second assignment of error.

prong of the *Petro* test examine whether the purportedly new evidence is, in some manner, material to the case. *Turner, supra*, at *5; *Petro, supra*, at syllabus.

**{¶27}** In its judgment entry, the trial court applied the first prong of the two-step analysis for recantation testimony, concluding that G.B.'s December 2021 testimony was "not reliable because it is not credible and does not tell a true story as portrayed by other credible witnesses." Doc. 235. The trial court then noted that, because G.B.'s December 2021 testimony did not pass the first prong of this analysis, "it is not necessary for the Court to resolve the question [of] whether the witness's testimony could have affected the outcome of the trial in this situation[.]" Doc. 235. Tebelman argues that the trial court erred in determining that proceeding to the second prong was unnecessary to the disposition of this case and points to the fact that the test from *Easterling* states that "the trial court *must make* two findings * * *." (Emphasis added.) *Easterling, supra*, at third paragraph of the syllabus.

**{¶28}** However, the language of the *Easterling* test clearly means that, to prevail on the motion for a new trial, the recantation testimony must be believable *and* must be capable of materially changing the outcome of the trial. Thus, if one of these prongs is not satisfied, then the recantation does not meet the test and will not be able to serve as the basis for granting a motion for a new trial. *See State v. Perdue*, 7th Dist. Mahoning No. 04 MA 119, 2005-Ohio-2703, ¶ 18 (*If* the trial court determines the recantation is believable, the trial court *must then* determine whether

the recanted testimony would have materially affected the outcome of trial.) (Emphasis added.); *State v. Phillips*, 10th Dist. Franklin No. 14AP-362, 2014-Ohio-4947, ¶ 16. In its judgment entry, the trial court was merely stating that, because the December 2021 testimony was not believable, this purported recantation could not, given the facts of this case, pass the second prong regardless of whether an express finding was made that the second prong was not satisfied.

**{¶29}** Even though the trial court suggested that a formal finding on the second prong was not necessary, it nonetheless made a finding as to whether G.B.'s December 2021 testimony satisfied the second prong of the two-step analysis for recantation testimony. The trial court concluded that this testimony "would not have affected the outcome [of the trial] as the physical and medical evidence along with the testimony presented was significant and a jury could not have found in the alternative based upon the newly discovered testimony * * *." Doc. 235. *See also Tebelman, supra*, at ¶ 24. Thus, contrary to Tebelman's assertions, the trial court did consider whether G.B.'s December 2021 testimony was material.

**{¶30}** Tebelman also argues that the trial court erred in drawing this conclusion, asserting that the medical experts who testified at trial drew their findings from examinations that were conducted after G.B. made her allegations against him. He asserts that this evidence "depended on the credibility of G.B.'s original disclosure." Appellant's Brief, 19. For this reason, Tebelman argues that

the trial court erred when "it weighed G.B.'s credibility against testimony which would have materially changed in light of her recantation, to rule that her recantation is incredible." *Id.*

**{¶31}** However, a medical examination can provide observations or evidence that are independent of the alleged victim's assertions. This evidence can be used to evaluate the alleged victim's story and may be able to corroborate aspects of the allegations. Further, this medical evidence described some significant injuries that G.B.'s young body had sustained to her vaginal and anal cavities. The very nature of these injuries begs for an explanation. A believable account of what happened to G.B. on November 8, 2008 will provide a credible explanation as to how she incurred these kinds of injuries in these areas of her body.

**{¶32}** At Tebelman's trial, there was a substantial amount of medical evidence available for consideration. Doc. 235, Ex. C- E, Tr. 306-349, 622-643. The medical experts either gave analyses of their firsthand observations of G.B.'s physical condition or analyses of her relevant medical records. This medical evidence was not entirely dependent upon the content of G.B.'s allegations. Thus, in this case, the medical evidence could provide the trial court with a basis to evaluate G.B.'s testimony at the December 2021 hearing and her testimony at the 2009 trial to determine which account was more credible.

**{¶33}** On appeal, Tebelman's argument rests on the flawed assumption that the medical evidence presented at trial was entirely dependent on the content of G.B.'s contemporaneous allegations. However, he has not demonstrated how G.B.'s testimony at the December 2021 hearing invalidated the specific findings of these prior medical examinations. As a result, Tebelman has not demonstrated how the trial court erred in relying upon the medical evidence in the process of evaluating G.B.'s testimony from December 2021. Accordingly, his second assignment of error is overruled.

*Third Assignment of Error*

**{¶34}** Tebelman argues that the presence of a question mark on the nineteenth page of the trial court's final judgment entry indicates that the judge never reached a conclusion as to what legal standard governed this case.

Legal Standard

**{¶35}** Crim.R. 52(A) defines a harmless error as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). "In most cases, in order to be viewed as 'affecting substantial rights,' 'the error must have been prejudicial.'" *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36, quoting *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. "Harmless error does not affect the outcome of the case and, thus, does not warrant a judgment to be overturned or

set aside." *State v. Costell*, 3d Dist. Union No. 14-21-02, 2021-Ohio-4363, ¶ 42, quoting *State v. Wilson*, 3d Dist. Allen, No. 1-09-53, 2010-Ohio-2947, ¶ 26.

Legal Analysis

**{¶36}** As the basis of this assignment of error, Tebelman identifies the following statement in the trial court's judgment entry of March 11, 2022:

> **Although it is not necessary for the Court to resolve the question [of] whether the witness's testimony could have affected the outcome of the trial in this situation?  This Court would note that it would not have affected the outcome as the physical and medical evidence along with the testimony presented was significant and a jury could not have found in the alternative based upon the newly discovered testimony presented on behalf of the motion.**

Doc. 235.  Tebelman identifies the question mark in this paragraph as the basis of the alleged error in his arguments herein.

**{¶37}** "[A] 'typographical error' * * * [is] a mistake made in the typing process, perhaps a misspelling of a word or leaving a word out of a sentence." *State v. Miller*, 2014-Ohio-4998, 23 N.E.3d 278, fn. 4 (3d Dist.).  In this situation, the trial court appears to have inserted a question mark in a place where a comma had been intended.  The intent of the trial court in these statements remains clear despite this typographical error.  Further, the statement before the question mark also indicates that the remainder of this particular paragraph is not necessary to the disposition of this case, making it even harder for the appellant to carry the burden

of establishing prejudicial error on the basis of the typographical error in this paragraph.

**{¶38}** In his arguments, Tebelman has not demonstrated that this typographical error affected his substantial rights. "[T]he harmless-error rule, was created in essence to forgive technical mistakes." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 24. The error in punctuation identified by Tebelman in this assignment of error is a technical mistake that epitomizes harmless error. *Id. See also State v. Lux*, 2d Dist. Miami No. 2010 CA 30, 2012-Ohio-112, ¶ 42; *State v. Conschafsky*, 4th Dist. Scioto No. 2057, 1992 WL 329427, *3 (Nov. 6, 1992). Because Tebelman has failed to identify a reversible error in this argument, his third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶39}** Tebelman argues that the trial court improperly assessed the credibility of G.B.'s testimony in its judgment entry.

Legal Standard

**{¶40}** "A witness recants * * * by formally or publicly withdrawing or repudiating earlier testimony." *State v. Waddy*, 2016-Ohio-4911, 68 N.E.3d 381, ¶ 35 (10th Dist.), quoting *State v. Covender*, 9th Dist. Lorain No. 07CA009228, 2008-Ohio-1453, 2008 WL 834417, ¶ 21 (Dickinson, J., concurring in part and dissenting

in part). "A witness's recantation of testimony can be newly discovered evidence *
* *." *T.S.*, *supra*, at ¶ 35, quoting *Woodward, supra*, at ¶ 35.

**{¶41}** However, "[r]ecantation by a significant witness does not, as a matter
of law, entitle the defendant to a new trial." *Woodward* at ¶ 20.

> **In determining whether to grant a new trial on the basis of recanted testimony, the trial court must make two findings: (1) which of the contradictory testimonies of the recanting witness is true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?**

*Turner*, *supra*, at *5, citing *Easterling*, *supra*, at third paragraph of the syllabus. *See also State v. Quinn,* 2d Dist. Clark No. 2014-CA-95, 2016-Ohio-140, ¶ 15; *State v. Hatton*, 4th Dist. Pickaway No. 13CA26, 2014-Ohio-3601, ¶ 13; *State v. Fortson*, 8th Dist. Cuyahoga No. 82545, 2003-Ohio-5387, ¶ 13; *State v. Meek*, 10th Dist. Franklin No. 16AP-549, 2017-Ohio-9258, ¶ 21.

> **Because measuring the credibility of witnesses is the responsibility of the trial court, only after the trial court determines that a witness's testimony is to be believed does the court move on to determining whether the new evidence would materially affect the outcome of the trial.**

*Phillips*, *supra*, at ¶ 16.

**{¶42}** However, "[r]ecanting affidavits and witnesses are viewed with
extreme suspicion because the witness, by making contradictory statements," may
have "lied at trial, or in the current testimony, or both times." *State v. Gray*, 8th
Dist. Cuyahoga No. 92646, 2010-Ohio-11, ¶ 29. For this reason, "[r]ecanting

testimony ordinarily is unreliable and should be subjected to closest scrutiny." *State v. Moore*, 99 Ohio App.3d 748, 755, 651 N.E.2d 1319, 1324 (1st Dist. 1994), quoting *Taylor v. Ross*, 150 Ohio St. 448, 38 O.O. 314, 83 N.E.2d 222 (1948), paragraph three of the syllabus. *See also State v. Collier*, 8th Dist. No. 103857 2016-Ohio-4951, ¶ 87, citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-1234, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari). "Consequently, 'there must be some compelling reason to accept a recantation over testimony given at trial.'" *Hatton, supra*, at ¶ 12. "The recantation must so affect the character of the evidence that there is a strong probability that a different verdict would result." *Easterling, supra*, at 62, citing *State v. Lopa*, 96 Ohio St. 410, 117 N.E. 319 (1917).

{¶43} "A 'victim's recantation is an issue of credibility.'" *State v. Elliott*, 2022-Ohio-3778, 199 N.E.3d 944, ¶ 28 (3d Dist.), quoting *State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶ 14. When a motion requesting a new trial on the basis of recantation testimony is filed, "the trial court, acting as the finder of fact, must assess the credibility of the alleged recanting testimony." *State v. Watson*, 12th Dist. Butler No. CA2016-08-159, 2017-Ohio-1403, ¶ 30.

> **[I]n order to grant a motion for new trial based on recanted testimony, the trial court must be reasonably well satisfied that the trial testimony initially given by the witness was false (and, by implication, that the recanted testimony is credible and true).**

Case No. 12-22-04

*Woodward, supra*, at ¶ 22. "When acting as the trier of fact, the trial court is free to determine the credibility of witnesses and disregard testimony it does not find credible." *State v. Nahhas*, 11th Dist. Trumbull No. 2001-T-0045, 2002-Ohio-3708, ¶ 34. In reviewing such a credibility determination, an appellate court's

> **role is very limited because we do not have the same opportunity that the trier of fact has in being able to see the witnesses testify and their demeanor while they testified. Instead, we have only the printed words of the record.**

*State v. Wood*, 12th Dist. Madison No. CA97-08-034, 1998 WL 281301, *2 (June 1, 1998).

Legal Analysis

**{¶44}** The first prong of the two-step analysis set forth above requires a trial court to determine "which of the contradictory testimonies of the recanting witness is true, and if the recantation is believable * * *[.]" *Turner*, *supra*, at *5. The arguments raised in this assignment of error challenge the ways in which the trial court evaluated G.B.'s testimony at the December 2021 hearing to determine whether her trial testimony or her December 2021 testimony was true and believable.[2] Tebelman raises four main arguments to establish that the trial court's

---

[2] In the first assignment of error, the appellant rejected the standard for evaluating purported recantation testimony that was derived from *Easterling, supra,* at paragraph three of the syllabus. Some of the arguments in the fourth assignment of error question the trial court's evaluation of G.B.'s December 2021 testimony and are partially premised on a rejection of the standard in *Easterling*. However, as this district has relied on this standard in the past, we will rely upon it to decide whether the trial court properly evaluated G.B.'s testimony at the December 2021 hearing in this assignment of error. *Turner, supra*, at *5; *Howard, supra*, at *1.

-24-

conclusions on the truth and believability of her December 2021 testimony were the result of an unsound reasoning process.

**{¶45}** First, Tebelman argues that, in its analysis, the trial court erred by failing to question G.B.'s ability to be a competent witness at the time of his trial in 2009. However, the issue of G.B.'s competency was raised in Tebelman's direct appeal from his conviction. *Tebelman, supra*, at ¶ 13. After examining the record, this Court concluded that

> **G.B. demonstrated that she knew her full name, birth date, and age; the city she lived in at the time of the incident and where she resided thereafter and who she lived with in both cities including the names of the pets. G.B. clearly articulated that she was sitting in a courtroom for the sole reason to tell the truth. She described the surroundings where the incident with the defendant occurred and the manner in which he touched her and that the first person she told about the incident was her Grandma Kim.**

> **Tebelman contends that this testimony does not establish G.B.'s competency because she made references to porcupines, blueberry bushes, and Dora the Explorer. He argues that the trial court should have inquired whether she could discern fiction from reality. In reviewing the entire transcript, we find that these references are rare and are used only to place adult actions into a child's context. Thus, they are not pertinent enough to detract from the trial court's overall competency determination.**

> **G.B.'s testimony clearly established that she satisfied the standards in [*State v.*] *Frazier*[, 61 Ohio St.3d 247, 250-251, 574 N.E.2d 483 (1991)] and as such we cannot find that the trial court abused its discretion. Moreover, even assuming, arguendo, that the trial court erred in finding G.B. competent to testify, we find no plain error. In addition to G.B.'s testimony, there was medical testimony introduced which corroborated G.B.'s statements admitted at trial. Thus, we find that there was substantial**

**evidence warranting the jury to convict Tebelman of rape and therefore we cannot say that the outcome of the trial would have been different if the court had not permitted G.B. to testify at trial. In sum, the testimony elicited from G.B. at her competency hearing so clearly established her competency under the *Frazier* standards that we cannot find the trial court erred in finding her competent to testify under either standard of review.**

*Id*. at 22-24. Thus, in applying a plain error standard of review to this issue on Tebeleman's direct appeal, this Court concluded (1) that the trial court did not err in finding G.B. to be competent to testify and (2) that, even if the trial court erred in finding her to be competent, there still remained "substantial evidence warranting the jury to convict Tebelman of rape * * *." *Id*. at ¶ 24.

{¶46} "It is well settled that res judicata precludes a defendant from raising in a new-trial motion any issues that were raised or could have been raised in his direct appeal." *State v. Hayden*, 2d Dist. Montgomery No. 27589, 2017-Ohio-9308, ¶ 6.

**[U]nder the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant * * * on an appeal from that judgment.**

*State v. Morrissey*, 2022-Ohio-3519, 198 N.E.3d 554, ¶ 8 (3d Dist.), quoting *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus.

{¶47} Tebelman's arguments about G.B.'s competence to testify as a witness in 2009 rely on materials that were in the record at the time of his direct appeal. For

this reason, he could have raised these arguments at that time. The text of our prior decision in *State v. Tebelman* demonstrates that he did, in fact, raise most of these arguments on direct appeal. *Tebelman, supra*, at ¶ 22-24. Accordingly, the doctrine of res judicata applies to the arguments in Tebelman's brief about G.B.'s competence to testify as a witness at his trial in 2009.

**{¶48}** Second, Tebelman argues that the trial court failed to consider alternate explanations for the injuries that G.B. sustained in 2008. At trial in 2009, the State called several experts to interpret the results of several medical examinations that had been conducted on G.B. in late 2008. Dr. Robert F. Wood, who works as a physician in the emergency department at Toledo Hospital, testified that G.B. had suffered two distinct lacerations on her rectum and that she exhibited discomfort during the examination. Doc. 235, Ex. C, Tr. 306, 308. He affirmed that these lacerations appeared to be the result of "diagnostic penetration" and that G.B. had "suffered blunt force trauma to her anal region as a result of penetration[.]" *Id*. at 310, 311. On cross-examination, Dr. Wood reported that G.B. told him that "her mother's boyfriend" caused the injuries. *Id*. at 317.

**{¶49}** Dr. Megan L. McGraw, who works for Nationwide Children's Hospital and is trained in the area of child sexual abuse, also testified at Tebelman's trial. Doc. 532, Ex. D, Tr. 317. Dr. McGraw testified that she conducted an examination of G.B.'s vaginal and hymenal areas. *Id*. at 322. She stated that G.B.

had redness and swelling in her vaginal cavity. *Id*. at 323-324. Dr. McGraw stated that these particular discoveries were best classified as nonspecific findings, meaning that they could possibly have other medical causes besides sexual abuse. *Id*. at 323. She then explained that these two observations were consistent with G.B.'s report that she had been penetrated but would not, by themselves, necessarily be diagnostic of sexual abuse. *Id*. at 325. However, the medical examination of G.B.'s vaginal region also revealed a posterior fourchette laceration. *Id*. Dr. McGraw stated that this laceration would "in and of itself" be an indication of trauma. *Id*. at 325, 334.

{¶50} Dr. McGraw then testified that she conducted an examination of G.B.'s anal region on November 19, 2008. Doc. 235, Ex. D, Tr. 326-327. She was able to compare her observations to the medical records from the examination that had occurred on the night of G.B.'s initial disclosure on November 4, 2008. *Id*. Based on these records and her observations, Dr. McGraw concluded that the lacerations in this area of G.B.'s body had experienced healing by November 19, 2008. *Id*. She concluded that G.B. "had significant trauma to her anal area, including penetration." *Id*. at 327. Dr. McGraw observed "bluish discoloration" in the areas where the lacerations had been. *Id*. at 330. The following exchange then occurred:

-28-

> **[Prosecutor:] And, again, was the traction on Exhibit 8 then, the point of that is you're able to observe the depth of the laceration; is that correct?**
>
> **[Dr. McGraw:] Correct, correct. If you look, we initially don't see it—one of the mimics that you can see is anal fissures. Sometimes those, any child can get related to constipation and that would be a very superficial tear that you would see as a squiggly line along here. (Indicating) But when you look at [G.B.'s] * * * photographs, this is actually something that extends much deeper. It's a much more significant laceration or tear to the skin.**

*Id.* at 331. She then explained that a child with "significant trauma," such as that suffered by G.B., "may have a history of having bleeding that would be brought to the attention of the caregiver that would result in them seeking medical care." *Id.* Dr. McGraw's testimony also indicates that she drew these conclusions about the trauma that G.B. had suffered with the awareness that G.B. had a urinary tract infection in this general timeframe. *Id.* at 338.

{¶51} At the 2009 trial, the Defense called Dr. Randall S. Schlievert, who works as a child abuse pediatrician at the University of Toledo, to testify. He described the process of examining a child who has potentially suffered from sexual abuse. Doc. 235, Ex. E, Tr. 622-627. Part of the examination involves placing a blue dye in the areas that may have been the loci of the sexual abuse. *Id.* at 627.

> **The purpose is if * * * there's any abrasions on the skin, the dye will stain those abrasions; because the cells in that area have nuclei where the DNA is, but they won't stain the regular skins that's not injured because that skin is actually dead and doesn't have those nuclei. So, in essence, it's just a physical way in helping**

-29-

> **to determine if there's possibly abrasions there that may not be detectible with your own eye.**

*Id*. He concluded that the reports of "dye uptake" alone are not enough to support a conclusion of sexual trauma. *Id*. at 630. He further explained that it

> **is helpful to know * * * how deep an injury is. For example, superficial injuries, little tears in the skin that are just on the surface may heal in a few days, and those could have causes such as constipation or diarrhea or rough wiping. But something like a tear, which is deeper past the superficial layers of the skin, is something that really has only been documented when there's been some type of blunt trauma to the anus or surrounding tissues. So we look for signs of that. We would look for the history to see if we can correlate what we're seeing with the child's exam.**

*Id*. at 628. He affirmed that the "descriptions of the anal tear as seen by the SANE nurse and Dr. McGraw would be indicative 100 percent of anal rape * * *." *Id*. at 631. *See Id*. at 636. He testified that, if these injuries had occurred on G.B.'s "arm, face, leg, it would have likely required some stitches." *Id*. at 638.

**{¶52}** Dr. Schlievert testified that the injuries were consistent with the allegations that G.B. had reported. Doc. 235, Ex. E, Tr. 636. He explained that by "consistent" he meant that the injuries "could be" indicators of sexual abuse but that he would not draw this conclusion "alone without a full history that I know of that I've personally obtained I would say proves it, but it's certainly something that could have been happening." *Id*. at 640. He further qualified that, without the history from the patient, he could not determine that the cause was "more likely to be from sexual abuse than anything else." *Id*.

**{¶53}** Against this evidence from his trial, Tebelman here argues that alternative explanations for these serious injuries should have been considered by the trial court in deciding his motion for a new trial. At the December 2021 hearing, the following exchange occurred between Tebelman's counsel and G.B.:

> **[Tebelman's Counsel:]** Were there any on-going [sic] medical issues that you had at the time that could explain that irritation that the doctors saw on your vagina or your anus?
>
> **[G.B.:]** When I was younger, it has continued into my later life, I struggle with constipation, and it was very hard for me to go to the bathroom at the time. And I remember having to go to the doctor, because I was scared to go number two because it hurt so bad. And there was tearing. I remember the doctors telling me that there was tearing, and I had to take laxatives. But I did have trouble going to the bathroom when I was younger.
>
> * * *
>
> **[Tebelman's Counsel:]** Do you remember that at the time you were experiencing a medical condition, such as a [urinary tract infection] UTI or something similar?
>
> **[G.B.:]** Yes, I had UTI's often because I did not wipe myself correctly when using the bathroom, so I would get the UTI's and the infection.

Tr. 27, 33. Importantly, the Defense was not simply suggesting that G.B. was not sexually assaulted by Tebelman. The Defense was suggesting that G.B. was not sexually assaulted at all and that her injuries were solely the result of constipation or urinary tract infections.

**{¶54}** However, no evidence was presented by the Defense that would suggest the significant injuries sustained by G.B.'s young body could have been solely caused by constipation or urinary tract infections. At the December 2021 hearing, the following exchange occurred:

> **[Prosecutor:] The affidavit that you signed includes a statement: I hereby state that as a child I experienced on-going medical conditions which, without the weight of my false statements, would explain the physical evidence used to convict Mr. Tebelman. Do you remember signing on that statement when you executed the affidavit?**
>
> **[G.B.:] Yes, I do believe so.**
>
> **[Prosecutor:] You agree, however, that you really don't know what the physical evidence was to convict Mr. Tebelman; true?**
>
> **[G.B.:] True.**
>
> **[Prosecutor:] The statement that your on-going medical conditions explain the physical evidence used to convict him [Tebelman], you really don't know that that's true; correct?**
>
> **[G.B.:] Not 100 percent with everything, but some of it I do. I can't explain.**

Tr. 54-55. G.B. indicated that she was never told that the anal tears on her body in November of 2008 were the result of constipation. Tr. 58. She affirmed that this was "simply her opinion * * *." Tr. 58. The following exchange then occurred:

> **[Prosecutor:] Do you have any information at all or any awareness that you did sustain injuries to your anus and vagina in November of 2008?**
>
> **[G.B.:] I remember being hurt.**

**[Prosecutor:] Do you believe you were hurt due to constipation?**

**[G.B.:] I do believe, yes.**

**[Prosecutor:] If evidence exists that contradicts your feelings, you simply don't know because you haven't looked at it; is that fair?**

**[G.B.:] Correct.**

Tr. 61. Further, G.B. does not appear to have remembered or been made aware of the extent of injuries that she had endured as a small child. She admitted that she was not aware that there were perianal lacerations on her anus or that there was a tear to her posterior fourchette. Tr. 65-66. While she knew that she had been through medical examinations, G.B. said that she did not remember these examinations and did not know what conclusions medical experts had drawn from these examinations. Tr. 52, 54, 66-68.

{¶55} However, the State produced evidence at Tebelman's trial in 2009 that indicated these injuries were not the result of G.B.'s ongoing medical conditions. Dr. McGraw and Dr. Schlievert dismissed constipation as a cause of deep lacerations or tears in the anal region during their testimony at trial. Doc. 235, Ex. D, Tr. 331. Doc. 235, Ex. E, Tr. 628. Dr. McGraw was also aware that G.B. had previously had urinary tract infections but did not appear to interpret this prior condition as a potential cause of these lacerations. Doc. 235, Ex. D, Tr. 338.

Further, Dr. Wood's testimony indicated that G.B.'s anal injuries were caused by forcible penetration.  Doc. 235, Ex. C, Tr. 310-311.

{¶56} There were also questions about what materials G.B. had been able to examine prior to the December 2021 hearing:

> **[Prosecutor:]  There is some statements from your mom within the counseling records that you have asked to see the evidence in this case, but she didn't think you were ready; does that ring a bell?**
>
> **[G.B.:]  Yes, it does.**
>
> **[Prosecutor:]  Now that I've said that, is it correct that you've asked to see the evidence in this case?**
>
> **[G.B.:]  I do believe so, yes.**
>
> **[Prosecutor:]  Is it correct that your mom restricted you from seeing the evidence in this case?**
>
> **[G.B.:]  Yes.  I was not allowed to see anything, whether I asked my mom or my grandmother, I was not allowed to see anything.**
>
> **[Prosecutor:]  Is it your sense that they thought it was in your best interest not to rehash the events from 2008 and 2009?**
>
> **[G.B.:]  My mom said that it was—that she didn't think I was ready.  My grandma said that I wasn't ready to know the full truth of what happened.**

Tr. 41-42.  G.B. also testified that she was not aware that a transcript of Tebelman's 2009 trial existed or that she had access this document.  Tr. 43-44.  While she had not viewed the various medical records or the evidence presented at trial, G.B. agreed that it would be in her interest to examine these materials.  Tr. 44-45.

**{¶57}** The trial court's judgment entry indicates that it examined the relevant medical evidence and the testimony from the December 2021 hearing. The medical evidence documents multiple lacerations to G.B.'s body that the medical experts did not attribute to causes such as constipation or urinary tract infections. The testimony at the December 2021 hearing did not provide a plausible alternative explanation for these significant injuries to G.B.'s body. Given the evidence presented at trial and at the December 2021 hearing, we cannot conclude that the trial court erred by failing to find that the lacerations that G.B. had endured as a child were caused by constipation or urinary tract infections rather than through forcible penetration.

**{¶58}** Third, Tebelman argues that the judge erred by weighing G.B.'s December 2021 testimony against the trial testimony of medical experts that the Judge never observed. However, in 2009, this case was tried before a jury that was able to examine the credibility of the medical experts and that then returned a verdict of guilty on the charge against Tebelman. *See Tebelman*, *supra*, at ¶ 12. Further, case law requires a purported recantation to be scrutinized for its truth, believability, and credibility. *Turner, supra*, at *5; *Woodward, supra*, at ¶ 22. *Easterling, supra*, at paragraph three of the syllabus. The applicable legal standard also directs a trial court to determine whether the purported recantation would have changed the outcome of the case. This process necessarily requires an examination of the

evidence that was produced at trial. In considering this expert testimony, the trial court was merely engaging in the required analysis.

{¶59} Further, Tebelman has not raised any arguments that would cast doubt on the credibility of the medical experts who testified at trial or would challenge the methodology they employed to reach their conclusions regarding the medical evidence. Aside from noting that the current trial court judge had not been present at his trial thirteen years ago, Tebelman raises no argument in this portion of his assignment of error that would suggest that the trial court erred in evaluating the evidence before it. Thus, Tebelman has not, with this argument, established that the trial court committed any error whatsoever.

{¶60} Fourth, Tebelman argues that the trial court acted unreasonably in concluding that G.B.'s testimony at the December 2021 hearing was not credible. On direct examination at this hearing, G.B. testified that she did not believe that Tebelman had sexually assaulted her in 2008. Tr. 34. She said, "I do not believe this man [Tebelman] is capable of touching a child, whether it was then or now. I cannot imagine it, nor can I see it happening ever." Tr. 34. She also testified that she realized that her statements were not true during the trial in 2009 and that she was scolded for privately communicating her doubts after she was questioned. Tr. 28.

{¶61} During cross-examination at the December 2021 hearing, the prosecutor asked questions to clarify the timeline of her recantation:

**[Prosecutor:] Following November of 2008, is it correct that your father gained custody of you?**

**[G.B.:] There was a time where I lived with my grandma. I'm not sure when my dad gained custody of me 100 percent. I just know I lived a good portion of my life with my grandma.**

**[Prosecutor:] At some point, did your dad gain custody?**

**[G.B.:] Yes.**

**[Prosecutor:] And then at some point, did custody revert back to your mother?**

**[G.B.:] Yes.**

**[Prosecutor:] And was that about mid 2017?**

**[G.B.:] I do believe so, yes, around that time.**

**[Prosecutor:] And around that time, perhaps June of 2017, you began to engage in counseling?**

**[G.B.:] Yes.**

**[Prosecutor:] And you continued to engage in counseling throughout 2017 and 2018 and into 2019?**

**[G.B.:] Up to this point, yes.**

**\* \* \***

**[Prosecutor:] Was it approximately May or June of 2018 that you first disclosed to your counselor that you had a different memory of the events from 2008?**

**[G.B.:] Yes.**

Tr. 39-40. Her counseling records indicated that she first raised doubts about her allegations against Tebelman on May 23, 2018 when she was fourteen years old. Tr. 103. The record from that date states that G.B. had "recently realized that she lied several years ago about her mom's boyfriend sexually molesting her." Tr. 104. G.B. testified that she disagreed with her counselor's characterization of her statements on that date. Tr. 104-105.

{¶62} G.B. further testified that her mother "believed that he [Tebelman] didn't do anything" and "that she stuck by his side" in the wake of the allegations in 2008. Tr. 37. G.B. believed that her mother had not communicated with Tebelman "in a very long time." Tr. 37. G.B. also stated that her mother was the person who helped arrange for her to meet with a private investigator after she had voiced doubts about her allegations. Tr. 107.

{¶63} During cross-examination, G.B. was questioned about the basis for her belief that Tebelman did not harm her as her trial testimony had alleged, leading to the following exchange:

> **[Prosecutor:] In November of 2008, did you have injuries to your anus that was due to physical trauma from forced penetration?**
>
> **[G.B.:] No.**
>
> **[Prosecutor:] Why do you think that you did not?**

**[G.B.:] If—I feel like if I was violated in such a manner it would stick with me. I would remember it every single day. Because that is something what happens to a sexual assault victim.**

**[Prosecutor:] What's the basis of your statement that a sexual assault victim would remember such an event every day?**

**[G.B.:] Because I have been sexually assaulted before, and I remember it all the time.**

**[Prosecutor:] At what age?**

**[G.B.:] 13.**

**[Prosecutor:] When you were much, much older?**

**[G.B.:] Yes.**

**[Prosecutor:] Have you ever researched whether or not there's any medical literature to support this idea that child sexual assault victims can suffer amnesia and not remember the assault?**

**[G.B.:] I never have done independent study, but I do—I am aware that some people can experience that. But everybody's different.**

**[Prosecutor:] True. But as I understand your testimony, your [sic] testifying today that you never had injuries to your anus due to a rape event because you don't remember it; is that fair?**

**[G.B.:] Fair.**

**[Prosecutor:] But you have asked to look at the evidence in this case, but your mother wouldn't let you see it; true?**

**[G.B.:] True.**

Tr. 51-52. She also indicated that she did not "have any memory of November 4, 2008[.]" Tr. 71.

**{¶64}** According to G.B.'s testimony, she assumes that she would clearly remember having been sexually assaulted as a five-year old on November 4, 2008; after roughly a decade, she did not have a memory of having been sexually assaulted as a five year old; therefore, she has concluded that she not was sexually assaulted. *See Covender, supra*, at ¶ 15 (considering a purported recantation in which the witness testified, "it [was her] * * * belief that if these things had happened, [she] * * * would remember them"). Thus, she did not testify that she remembers what happened on November 4, 2008 and, therefore, knows her trial testimony from 2009 does not correspond with what actually transpired. Rather, her conclusion is based on the fact that she cannot remember what had happened on November 4, 2008. Further, the trial court noted that no testimony was offered to support the assumption that an eighteen-year-old witness would necessarily have clear memories of a traumatic event that he or she experienced at age of five. Doc. 235.

**{¶65}** Further, as discussed previously, G.B.'s testimony at the December 2021 hearing suggested that her injuries were caused solely from constipation or urinary tract infections. Tr. 27, 33. She denied that her injuries were the result of "physical trauma from forced penetration," even though she had not been permitted to see the medical evidence from which such conclusions could be drawn. Tr. 51. Thus, G.B.'s testimony does not simply suggest that she was not sexually assaulted by Tebelman but that she was not sexually assaulted at all.

{¶66} Even beyond the question of whether she was intentionally penetrated, her testimony at the December 2021 hearing does not contain an explanation as to how she suffered injuries that were clearly the result of some form of blunt-force penetration. At the December 2021 hearing, G.B. also indicated that she did not know that her mother had blogged about how G.B. had been a victim of sexual assault but had insisted that someone other than Tebelman was responsible. Tr. 70. Thus, her mother's contemporaneous understanding of what caused G.B.'s injuries in 2008 does not appear to have been consistent with G.B.'s current understanding of what she believes to have caused her injuries as of December 2021.

{¶67} The trial court also examined the issue of G.B.'s ability to remember what had transpired in 2008. At the December 2021 hearing, G.B. indicated that she could not remember whether she was alone with Tebelman on November 4, 2008 or that her mother was away in Michigan on that date. Tr. 71-72, 73, 74. She also could not recall how or why she was transferred from Tebelman's care to her grandmother's care on the date of the alleged incident. Tr. 73-74.

{¶68} G.B. further could not recall the details of her disclosure to her grandmother; what prompted her grandmother to examine her physical condition; what prompted her grandmother to ask if she had been inappropriately touched; or what physical conditions her grandmother observed on her body that evening. Tr. 76-77, 156. *See* Doc. 235, Ex. B, Tr. 389. She also could not recall if she was

experiencing any "pain or discomfort" in the timeframe of the disclosure of her allegations to her grandmother. Tr. 157. She affirmed the following summation of her testimony as stated by the prosecutor:

> **As I understand your testimony, you believe in November of 2008 you made very innocent statements about the defendant helping you with bath time and so forth, and that those innocent statements were taken out of context by your grandma because of her own past experiences * * * [.]**

Tr. 155. She also admitted that she did not remember what she had said in between November of 2008 and April of 2009 about what Tebelman had done to her. Tr. 79. G.B. admitted that she did not remember telling her mother, on November 10, 2008, that Tebelman had hurt her. Tr. 82.

{¶69} Further, G.B. indicated that she did not remember undergoing multiple medical examinations; the results of her medical examinations; that medical experts testified at Tebelman's trial; that she went to counseling in 2008 and 2009; or that her counselor was named Diane Gable. Tr. 54, 58-59, 65, 67, 80, 81. G.B. concluded her testimony at the December 2021 hearing by admitting that she did not "know what the actual evidence submitted at trial was" and by affirming that "it doesn't matter what the evidence was because [she] * * * couldn't fathom the defendant [Tebelman] touching her inappropriately." Tr. 162.

{¶70} In assessing the credibility of G.B.'s testimony, the trial court summarized its conclusions with a statement that G.B. had made under oath at the December 2021 hearing:

> **My memory is not as strong as it was when it first happened, so having a refresher it brings back, because as a trauma response I try to repress it and not think about it, and have no memory of it. But seeing what was said it helps remembers [sic] things that I need to know to help me get through this, if that makes sense.**

Tr. 31. Thus, G.B. seems to be aware of the limits of her own memory in recalling the traumatic events that led to her painful injuries in November of 2008. Based on her apparent lack of memory, the trial court found that her testimony at the December 2021 hearing was not a credible account of what had actually transpired on November 4, 2008 or in the months leading up to Tebelman's trial.

{¶71} However, the trial court's credibility determination should not be taken to mean that G.B.'s words were not sincere or honest efforts to speak about what she could remember of a complicated series of events that occurred when she was just five years old. In this case, the finder of fact was charged with the responsibility of determining whether G.B.'s account at trial in 2009 or her account at the December 2021 hearing was more credible. G.B.'s trial testimony was closer to the alleged offense; congruent with the medical evidence; and was consistent with the accounts of other trial witnesses. By contrast, her December 2021 testimony

was over thirteen years removed from the incident; was inconsistent with the medical evidence; and contradicted details provided by the trial witnesses.

**{¶72}** Having examined the evidence in the record, we cannot conclude that the trial court erred in its credibility determination. In this case, G.B.'s trial testimony was more consistent with the physical evidence collected before Tebelman's trial. By contrast, the December 2021 testimony did not provide a credible explanation for her injuries and did not fit the testimony of other witnesses at trial. In this assignment of error, Tebelman has not demonstrated that the trial court abused its discretion in denying his motion for a new trial. Accordingly, his fourth assignment of error is overruled.

### *Fifth Assignment of Error*

**{¶73}** Tebelman argues that the trial court failed to consider the testimony of expert witness, Linda Ellerbrock.

### Legal Standard

**{¶74}** "[W]hen a party seeks an appeal, the appellant bears the burden of demonstrating error by reference to the record of the proceedings below, and it is the appellant's duty to provide the reviewing court with an adequate transcript." *State v. Wells*, 3d Dist. Seneca No. 16-88-2, 2002-Ohio-5318, ¶ 5. *See also State v. Clark*, 3d Dist. Wyandot No. 16-88-2, 1990 WL 7951, *1 (Jan. 29, 1990) (holding

that "App.R. 9 and App.R. 10 place the burden of obtaining a transcript of proceedings upon the appellant * * *").

> **When portions of the transcript necessary for resolution of assigned errors are omitted from the record, a court has nothing to pass upon and, thus, the court must presume the validity of the lower court's proceedings and affirm.**

*City of Columbus v. Hodge*, 37 Ohio App.3d 68, 523 N.E.2d 515 (10th Dist. 1987), at syllabus. Thus, in failing to ensure that a transcript is filed, an appellant fails to establish any alleged errors that depend upon the absent transcript for substantiation. *State v. Pringle*, 3d Dist. Auglaize No. 2-03-12, 2003-Ohio-4235, ¶ 10.

Legal Analysis

**{¶75}** This assignment of error raises arguments that are based upon the testimony of Linda Ellerbrock ("Ellerbrock"). According to the appellant's brief, Ellerbrock testified as an expert before the trial court at a hearing on February 14, 2022. Appellant's Brief, 19-20. However, the transcript of the proceeding on February 14, 2022 was not filed with the record in this appeal. In the absence of this transcript, Tebelman cannot establish the errors claimed in this assignment of error. For this reason, we "must presume the validity of the lower court's proceedings * * *." *Hodge, supra*, at syllabus. Accordingly, Tebelman's fifth assignment of error is overruled.

*Sixth Assignment of Error*

**{¶76}** Tebelman argues that the trial court gave dispositive weight to G.B.'s 2009 trial testimony and did not consider the effect of her December 2021 testimony on the credibility of her original testimony.

Legal Standard

**{¶77}** We herein reincorporate the legal standard for purported recantations as set forth under the fourth assignment of error.

Legal Analysis

**{¶78}** Tebelman asserts G.B.'s purported recantation cannot be evaluated by evidence presented at trial because the testimony she purports to recant was the basis of the evidence presented at trial. However, as noted previously, the testimony of other witnesses and the medical evidence presented at trial were not simply derivative of the allegations that G.B. had raised. Further, the content of G.B.'s testimony at the December 2021 hearing did not challenge the validity of the medical evidence or the credibility of Tebelman's trial testimony. For these reasons, this aforementioned evidence can provide a basis for evaluating the reliability of the testimony that G.B. gave in December 2021.

**{¶79}** We will first examine the trial court's use of the medical evidence that was produced at trial. The medical examinations revealed that G.B. had a laceration in her vagina and lacerations in her anus. Doc. 235, Ex. C, Tr. 306, 308. Doc. 235,

Ex. D, Tr. 325, 344. The medical experts testified that these anal lacerations were consistent with a forcible penetration of G.B.'s body and were highly indicative of rape. Doc. 235, Ex. C, Tr. 310-311. Doc. 235, Ex. D, Tr. 327. Doc. 235, Ex. E, Tr. 631, 638, 640. The existence of this evidence alone completely undermines Tebelman's claim in this assignment of error that G.B.'s allegations were the "entirety of the case against Rob [Tebelman]." Appellant's Brief, 21.

{¶80} Further, this expert testimony expressly discounted the likelihood of constipation as a cause of lacerations or tears that were of the depth and quality of those observed in G.B.'s body. Doc. 235, Ex. D, Tr. 331. Doc. 235, Ex. E, Tr. 628. Dr. McGraw testified with an awareness that G.B. had recently suffered from a urinary tract infection but did not draw any connection between that condition and the lacerations in her body. Doc. 235, Ex. D, Tr. 338. The existence and nature of these lacerations does not depend on the content of the allegations that G.B. raised against Tebelman. The trial court could examine whether G.B.'s trial testimony from 2009 or her testimony at the December 2021 hearing was more consistent with this medical evidence.

{¶81} At trial, G.B. testified that Tebelman penetrated her with his fingers and with a book. Doc. 235, Ex. A, Tr. 6. She also affirmed that Tebelman had "hurt her" in the upstairs of her home. *Id.* at 7. By contrast, in her December 2021 testimony, G.B. stated that she had come to believe that her injuries were caused by

constipation or urinary tract infections. Tr. 27, 23, 56, 61. She indicated that she did not believe that she had been forcibly penetrated at all. Tr. 50-51. However, she also indicated that she arrived at this belief without the benefit of having reviewed any of the medical evidence that had been documented and presented at trial. Tr. 162. Her testimony also revealed that she had not been made aware of the nature or extent of the injuries that she had sustained as a child to her vaginal or anal cavities. Tr. 53-54, 57-61, 65-68.

{¶82} In this case, G.B.'s trial testimony could account for the nature and extent of the injuries that she had sustained to her body. However, there is no indication from the medical evidence presented at trial or from the evidence presented at the December 2021 hearing that constipation or urinary tract infections could explain the presence of the lacerations that were observed in G.B.'s body. In its judgment entry, the trial court quoted the relevant portions of the testimony given by the medical experts at trial regarding the injuries that G.B. had sustained. Doc. 235. We cannot conclude that the trial court erred in relying on this medical evidence to evaluate G.B.'s testimony at the December 2021 hearing.

{¶83} Next, other witnesses at trial described the events of November 4, 2008. In particular, Tebelman testified that G.B.'s mother was out of town on November 4, 2008 and was not present in the house where they lived together with G.B. Doc. 235, Ex. G, Tr. 659. He then stated that G.B. was with him from roughly

3:45 P.M. when she got off the school bus to roughly 6:30 P.M. that evening when her grandmother picked her up at the house. *Id*. at 676-677. Tebelman described what had occurred during this timeframe as follows:

> **She came in, she had a snack, as usual. I don't remember what her snack was that day. But we watched—at four o'clock and 4:30 there's a show that she likes to watch that's called H2O. It's about girl mermaids, just a little kid show. We watch it every day after school at four and 4:30 when I'm not at work, we watch the show together. We watched that on the downstairs television.**
>
> **[B]efore that [watching the show] we had called her mom wanted me to call her mom because her mom wanted me to call her as soon as she got home from school because she was on the bus. * * * And then after that, we, I let her have some chocolate ice cream and I actually let her call her mom to tell her that she got to eat ice cream before supper, just to brag.**

*Id*. at 662. He then testified that G.B.'s mother called to tell him that G.B.'s grandmother was not going to be on time to pick up G.B. and would not be at the house until that evening. *Id*. at 663. Tebelman stated that, at "about five o'clock, we went outside to play in the leaves. We were out there for about an hour and then pretty much as soon as we came in * * * [G.B.'s grandmother] showed up." *Id*. at 664.

{¶84} However, at the December 2021 hearing, G.B. described the events the led to her disclosure at her grandmother's house on November 4, 2008 as follows:

> **So, how I remember it is that it was after ballet and tap, and I had gone to her [grandmother's] house, and she was in the bathroom,**

-49-

**and she had asked me if he [Tebelman] touched me, and I didn't know the difference between good touch, bad touch completely, I didn't understand everything, and I said yes * * *.**

Tr. 33. On cross-examination, the following exchange occurred:

**[Prosecutor:] Why is it that you think you had ballet or tap the day of that disclosure?**

**[G.B.:] Because that was the day that I was taken away from my family, so it's a little easier to remember for me.**

**[Prosecutor:] Well, if I told you that you did not have ballet or tap on that date, does that refresh your memory at all?**

**[G.B.:] No.**

**[Prosecutor:] You're adamant and sure that on the date you disclosed to Grandma Kim, you had ballet or tap?**

**[G.B.:] I'm pretty sure, yes.**

Tr. 73. The testimony at trial indicates that G.B. had dance classes on the weekends while her disclosure occurred on the evening of Tuesday, November 4, 2008. Doc. 235, Ex. B, Tr. 384.

{¶85} At trial, Tebelman gave a full accounting of the time that he spent alone with G.B. on the afternoon and early evening of November 4, 2008. His description of those events at trial does not fit with what G.B. believes to have occurred as related in her testimony at the December 2021 hearing. *See State v. Brown*, 186 Ohio App.3d 309, 2010-Ohio-405, 927 N.E.2d 1133, ¶ 42 (7th Dist.)

(considering whether a recantation was "contradictory to the basic facts established at trial").

**{¶86}** The trial court did not only examine the congruence of G.B.'s December 2021 testimony with the evidence that had been produced at trial but also considered the internal content of G.B.'s testimony at the December 2021 hearing. In describing the events surrounding her disclosure, G.B. could not recall that her mother was out of town on that date; that she had been alone with Tebelman for several hours that afternoon; that the date of her disclosure was a school day; or how she got from Tebelman's custody to her grandmother's custody.  Tr. 71- 74.  She also indicated that she did not "have any memory of November 4, 2008[.]"  Tr. 71. By the time of the December 2021 hearing, over thirteen years had transpired since G.B. first disclosed the allegations against Tebelman at the age of five.  For these reasons, the trial court noted its concerns about "the accuracy of her memory" in its judgment entry.  Doc. 235.  *See Brown* at ¶ 47 (considering whether a recanting witness was able to "remember basic facts of the crime").

**{¶87}** The analysis of the trial court in its judgment entry demonstrates that it did not summarily disregard G.B.'s testimony from the December 2021 hearing but instead scrutinized this purported recantation against Tebelman's own trial testimony and the medical evidence.  After conducting a thorough examination of the available evidence, the trial court concluded that G.B.'s testimony at the

December 2021 hearing did not provide a credible explanation of the physical harm that was documented from what had transpired on November 4, 2008.

**{¶88}** Tebelman ultimately argues that G.B.'s recantation broke any arguable link between him and the alleged offense. However, this assertion is faulty for two reasons. First, the trial court correctly concluded that other evidence linked Tebelman to the crime. Doc. 235. Second, on the basis of this other evidence, the trial court found that it could not rely on G.B.'s testimony from the December 2021 hearing as a reliable account of what had transpired. Because the trial court found that this purported recantation was not credible, the testimony that G.B. presented at trial can continue to stand as a link between Tebelman and the crime for which he received a conviction. *See Meek*, *supra*, at ¶ 27-28 (concluding in a case where the recanting witness provided the only testimony that linked the defendant to one of the charges that the outcome of the trial would not have been different because the recantation was found not to be credible).

**{¶89}** Finally, in this assignment of error, Tebelman also questions testimony of one of the medical experts who was called by the Defense to testify at trial. He suggests that the decision to call this witness constituted ineffective assistance of counsel. However, this argument is based on evidence that was presented at trial in 2009 and, therefore, could have been raised on direct appeal. For this reason, the doctrine of res judicata applies and prevents us from further examination of this

argument. *Hayden, supra*, at ¶ 6. Thus, because the arguments raised herein have been found to be without merit, Tebelman's sixth assignment of error is overruled.

*Seventh Assignment of Error*

**{¶90}** Tebelman argues that the trial court impermissibly allowed the State to engage in conduct that was designed to intimidate G.B. as a witness.

Legal Standard

**{¶91}** To establish prosecutorial misconduct, the "defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 29, quoting *State v. Merriweather*, 12th Dist. Butler No. CA2016-04-077, 2017-Ohio-421, ¶ 45.

> **Because prosecutorial misconduct implicates due-process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial [or proceeding], not the culpability of the prosecutor.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).**

*State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 162. The identified conduct is examined in the context of the entire proceeding. *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 30 (3d Dist.).

**{¶92}** To demonstrate prejudice, "the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the

proceeding would have been different." *State v. Cureton*, 9th Dist. Medina Nos.

03CA0009-M, 03CA0010-M, 2003-Ohio-6010, ¶ 27.

> **In evaluating a claim of prosecutorial misconduct, the Ohio Supreme Court commented that 'improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.' *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207, * * *.**

(Citations omitted.) *State v. Lane*, 108 Ohio App.3d 477, 484, 671 N.E.2d 272, 276,

(1st Dist. 1995). However, in evaluating a prosecutorial misconduct claim,

> **a presumption exists in a bench trial that the trial judge considered only the relevant, material and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary. *State v. Lott* (1990), 51 Ohio St.2d 160, [555 N.E.2d 293].**

*State v. Nelson*, 8th Dist. Cuyahoga No. 81286, 2003-Ohio-559, ¶ 21. *See also State*

*v. Wiles*, 59 Ohio St.3d 71, 86, 571 N.E.2d 97, 117 (1991).

Legal Analysis

**{¶93}** On appeal, Tebelman argues that the prosecutor intimidated G.B.

during cross-examination at the hearing on December 22, 2021. He identifies the

following exchange in support of this assertion:

> **[Prosecutor:] * * * Are you aware that you did testify in this case in 2009?**
>
> **[G.B.:] Yes.**
>
> **[Prosecutor:] Okay. Do you have a memory of doing that?**

[G.B.:]   Somewhat.   I'm not sure if it's exactly what you are referring to, but I do have a memory of sitting in a courtroom with a video playing of Rob [Tebelman], and them saying we can turn it off if you like.

[Prosecutor:]  Okay.  Do you have any other memories?

[G.B.:]  No.

[Prosecutor:]  Do you have any recollection of who was in the courtroom at the time you provided testimony?

[G.B.:]  No, not that I'm sure of.

[Prosecutor:]  Do you have any other memories from that day?

[G.B.:]  No.

[Prosecutor:]  In your interview with the defense investigator, you state the following: I had just got done talking to my Lawyer Todd in a room, and we came out and he's like, and I said, I think I said something like what if I told you that this didn't happen, and he's like, [G.B.], don't joke around with me, this is very serious.  And I felt like really, like oppressed, and I didn't want to say anything more about it * * *.  Do you recall saying that to the investigator?

[G.B.:]  Something along those lines, yes.

[Prosecutor:]  Do you really have a memory of that taking place, * * * [G.B.]?

[G.B.:]  Yes, I do remember saying that it didn't happen, and then being scolded for it.

[Prosecutor:]  Okay.  Do you understand that I'm the person that you're referring to as Lawyer Todd?

[Defense Counsel:]  Judge, may we sidebar?

[Judge:]  Basis?

**[Defense Counsel:]  I think the prosecutor's at risk of making himself a witness in the case, in which * * * we'll need a recusal.**

Tr. 87.  At a sidebar, the judge overruled this objection.  Tr. 89.  The questioning continued as follows:

**[Prosecutor:] * * * [G.B.], do you understand that I'm the Lawyer Todd you're referring to in that statement?**

**[G.B.:]  Yes.**

**\* \* \***

**[Prosecutor:]  Your memory is that you were alone with Lawyer Todd when you made that statement?**

**[G.B.:]  Excuse me, yes.**

**[Prosecutor:]  Where were you located when you made that statement?**

**[G.B.:]  I'm not sure of definite place.**

**[Prosecutor:]  Was it before the trial or during the trial?**

**[G.B.:]  I'm not sure.**

**[Prosecutor:]  Was it in the courtroom?**

**[G.B.:]  No.**

**[Prosecutor:]  Was it in a side room somewhere?**

**[G.B.:]  I do believe so, yes.**

**[Prosecutor:]  You don't know if it was at an office or the courthouse, though?**

**[G.B.:]** No.

**[Prosecutor:]** Do you recall who would take you to either the prosecutor's office or the courthouse?

\* \* \*

**[G.B.:]** I do believe it was my grandma who took me everywhere.

\* \* \*

**[Prosecutor:]** Your testimony is that you and I were in a room, you made the statement that was just described, you were scolded; correct, that's your testimony?

**[G.B.:]** Yes.

**[Prosecutor:]** And then we left the room?

**[G.B.:]** Yes.

**[Prosecutor:]** When you were presented with the affidavit, the affidavit also contained a paragraph describing what you just testified to; true?

**[G.B.:]** True.

**[Prosecutor:]** You understand that an affidavit is a statement made under oath?

**[G.B.:]** Yes.

**[Prosecutor:]** Do you understand the consequences of signing an affidavit under oath if you're not being truthful?

**[G.B.:]** Not fully.

**[Prosecutor:]** Are you aware that if you knowingly make any false statements within the affidavit, it could result in a criminal prosecution?

**[G.B.:] I'm not aware of that.**

Tr. 90-92. At this point, defense counsel objected, arguing that the prosecutor had "threatened [G.B.] * * * with criminal prosecution * * *." Tr. 92. After a sidebar, the judge overruled the objection, finding that "under none of those questions and statements in any aspect was [the] prosecution threatening." Tr. 93.

{¶94} When the hearing reconvened, the judge informed G.B. about the following:

> **[Judge:] You understand that by being under oath, be it through affirmation or affidavit or questions today, and you were to be determined that you lied or made those statements incorrectly, knowing that those statements were incorrect, do you understand that that could carry with it criminal penalties.**
>
> **[G.B.:] Yes.**
>
> **[Judge:] Noting that, you have every availability and opportunity to have counsel represent you. Would you prefer or would you want to have counsel represent you?**
>
> **[G.B.:] I'm not exactly sure I know what all that entails.**
>
> **[Judge:] Okay. That would mean * * * that you would have availability to seek your own counsel, or make a request to this Court for appointment of counsel, have the availability to discuss your testimony with that counsel.**
>
> **[Judge:] And [G.B.] * * * I want you to understand that no one is implying that you've made any misstatements, but it is the Court's responsibility as is every attorneys responsibility that, one, [you] feel comfortable, two, that you understand what your rights are; do you understand that?**

**[G.B.:]  Yes.**

Tr. 95-96.  The prosecutor then resumed questioning as follows:

**[Prosecutor:]  * * * [G.B.:]  if at any point as we talk you decide yes, you do want an attorney, simply say so, okay, and we will pause so we can address that; okay?**

**[G.B.:]  Okay.**

**[Prosecutor:]  The statement that you say you made that we've been talking about was in a room in which you were alone with Lawyer Todd; true?**

**[G.B.:]  I'm not sure.**

**[Prosecutor:]  That's what you told the defense investigator, that you were alone with Lawyer Todd when you made that statement; is that true?**

**[G.B.:]  I don't remember saying that.**

**\* \* \***

**[Prosecutor:] * * * [G.B.], paragraph 7 [of the affidavit] reads: During the course of trial I attempted to retract my statement in an interview with the prosecutor.  I was intimidated by the prosecutor's reaction, and chose to pretend I was making a joke. Was that your statement in the affidavit?**

**[G.B.:]  I do believe so.**

**[Prosecutor:]  That was a statement someone else wrote and handed to you to sign off on?  Someone else wrote that statement; true?**

**[G.B.:]  I did not write it, no.**

**\* \* \***

> **[Prosecutor:]  Are you affirming that statement within your affidavit?**
>
> **[G.B.:]  I don't know.**

Tr. 97, 101-102.  On appeal, Tebelman points to this exchange to argue that the prosecutor's questioning caused G.B. to "weaken[] her statement and subsequent testimony."  Appellant's Brief, 31.

{¶95} However, "[t]he very purpose of cross-examination is to test the accuracy, truthfulness, and credibility of the testimony of the witness."  *State v. Brentlinger*, 5th Dist. Fairfield No. 32-CA-83, 1984 WL 4471, *1 (Feb. 22, 1984). "The purpose of direct examination is to establish facts; the purpose of cross-examination is to cast doubt on facts established during direct examination."  *State v. Mays*, 6th Dist. Lucas No. L-12-1173, 2013-Ohio-3553, ¶ 18.  *See also State v. Grover*, 8th Dist. Cuyahoga No. 72250, 1998 WL 57086, *5 (Feb. 12, 1998) (holding that "[o]ne permissible purpose of cross-examination is to assail the credibility of the witness").

{¶96} Tebelman also argues that the prosecutor behaved improperly by inquiring into whether G.B. was aware that the act of knowingly making false statements under oath could be criminally prosecuted.  *See State v. Halley*, 93 Ohio App.3d 71, 79, 637 N.E.2d 937, 943 (10th Dist. 1994) (holding that "it may not be improper for the court or even a prosecutor to warn a witness of the penalties of perjury * * * out of the hearing of the jury * * *").  Even if the prosecutor's questions

about criminal penalties had been improper, there is no indication that, in the absence of these remarks, the result of this proceeding would have been different. *Cureton, supra*, at ¶ 27. As an initial matter, this proceeding was not a jury trial but occurred before a judge. There is no evidence in the record that would lead us to dispense with the presumption that the judge relied only on relevant considerations and evidence in reaching his conclusion in this case. *Nelson, supra*, at ¶ 21.

{¶97} Further, this line of questioning came after the portions of G.B.'s testimony that were most significant to the trial court's decision in its judgment entry, such as her admission that she could not remember the events of November 4, 2008 and her belief that her injuries were caused by constipation or urinary tract infections. Tr. 27, 23, 56, 61, 71. By this point in the hearing, she had also already given an account of the evening on which she disclosed her allegations that conflicted with Tebelman's trial testimony. Tr. 33, 71-72, 73, 74. Given the context of this entire proceeding, there is no indication that the outcome would have been different in the absence of the line of questioning challenged herein. Since Tebelman has not carried the burden of demonstrating that his substantial rights were prejudiced by this line of questioning, his seventh assignment of error is overruled.

*Eighth Assignment of Error*

{¶98} Tebelman argues that the trial court incorrectly concluded that he was the only person with access to G.B.

Legal Standard

{¶99} We herein reincorporate the legal standard for new trial as set forth under the first assignment of error.

Legal Analysis

{¶100} In this assignment of error, Tebelman asserts that the trial court erred by assuming that he was the only person with access to G.B.[3] He argues that others had access to G.B. in the days preceding her disclosure of the allegations against him. Importantly, in his brief, Tebelman bases these arguments on testimony that was produced at his trial in 2009 and not on G.B.'s testimony from the December 2021 hearing.

{¶101} The trial testimony indicates that, on the afternoon of November 4, 2008, G.B.'s mother left on a trip to Michigan. Doc. 235, Ex. B, Tr. 385. G.B. then came home from school and was alone with Tebelman for several hours until her

---

[3] Tebelman's brief broadly states that the trial court was incorrect to conclude that he "was the only person with access to GB." Appellant's Brief, 24. However, the primary issue from the testimony presented at trial does not appear to be whether Tebelman was the only person with access to G.B. but whether he was the only person alone with G.B. in the timeframe during which she sustained injuries to her vaginal and anal cavities. This assignment of error suggests that the trial court, in its judgment entry, operated on the assumption that Tebelman was the only person to have had any access whatsoever to G.B. in the days leading up to the disclosure of her allegations. However, the State, in its brief, and the trial court, in its judgment entry, appear to have operated on a much narrower assumption: that Tebelman was the only person to have been alone with G.B. in the timeframe during which she sustained injuries to her vaginal and anal cavities. We will examine this narrower assumption because this appears to be consistent with what the State argued and what the trial court assumed in this course of this case.

grandmother picked her up around 6:30 P.M. *Id*. at 387. When the grandmother arrived, G.B. was alone with Tebelman. *Id*. at 386. Her grandmother then drove G.B. straight to her (the grandmother's) house in Delphos. *Id*. at 385. G.B. arrived at her grandmother's house at roughly 6:50 P.M. *Id*.

{¶102} Since her grandmother had a meeting that evening, G.B. was left at her grandmother's house with her grandfather, who was joined shortly thereafter by a visiting family friend. *Id*. When the grandmother returned from the meeting, G.B.'s grandfather told her that he had observed G.B. "grabbing at herself * * *." *Id*. at 387. After the family friend had left, the grandmother took G.B. into the bathroom to examine the areas where G.B. was experiencing discomfort and observed indications of the injuries that G.B. had sustained to her vaginal and anal cavities. *Id*. at 387-388.

{¶103} Tebelman's testimony at his trial in 2009 confirms several aspects of this timeline. He affirmed that G.B. was with him "on November 2nd, November 3rd, and then November 4th[.]" Doc. 235, Ex. G. Tr. 673. He confirmed that G.B.'s mother was not at the house on November 4, 2008 because she was out of town. *Id*. at 675, 677. He then indicated that, on November 4, 2008, G.B. was with him from roughly 3:45 P.M. when she arrived home on the school bus until roughly 6:30 P.M. when her grandmother picked her up. *Id*. at 676-677.

{¶104} The medical experts who testified at trial noted the difficulty of establishing a precise timeline for an alleged instance of sexual abuse based solely on the progress that a victim's wound has made towards healing. Doc. 235, Ex. D, Tr. 331. Based on the condition of the wounds and the type of pain G.B. was experiencing at the time of the examination, these medical experts testified that the injuries could have been sustained anywhere from a few hours to several days prior to G.B.'s initial medical examination. Doc. 235, Ex. C, Tr. 313. Doc. 235, Ex. E, Tr. 631-632. In his brief, Tebelman emphasizes the inability of these experts to establish a narrow timeframe based on the condition of the injuries during the medical examinations of G.B. Appellant's Brief, 25.

{¶105} However, these medical experts also testified that an important part of establishing a timeline for alleged sexual abuse is determining when the child first experienced pain or discomfort from any injuries that had been incurred. Doc. 235, Ex. D. Tr. 331. Doc. 235, Ex. E, Tr. 636, 638. At trial, the Defense did not present any evidence that G.B. had reported any discomfort or pain that resulted from the injuries that she had sustained before she was alone with Tebelman on November 4, 2008. The testimony at trial indicated that G.B. manifested signs of discomfort at her grandmother's house. Doc. 235, Ex. B, Tr. 388. This is what prompted her grandmother to examine her condition and to ask G.B. what had happened. *Id*. at 388-389.

{¶106} The testimony at the December 2021 hearing does not contradict the evidence that was presented at trial to establish that Tebelman was alone with G.B. in the hours before she manifested signs of discomfort at her grandmother's house. The medical evidence indicated that she had sustained her injuries anywhere between several hours to several days before her initial medical examination. However, at the December 2021 hearing, she was unable to remember who else had been with her in this timeframe. Tr. 71. G.B. also indicated that she could not recall whether she had been alone with Tebelman on November 4, 2008. The following exchange occurred on this subject at the December 2021 hearing:

> **[Prosecutor:] You understand that on November 4th of 2008 you spent several hours alone with this defendant?**
>
> **[G.B.:] I don't remember specifically.**
>
> **[Prosecutor:] Do you have any reason to disagree with that?**
>
> **[G.B.:] I have no reason to disagree or agree.**

Tr. 155. She stated that she did not remember whether she was alone with Tebelman on the date in question on at least two other occasions during her testimony. Tr. 71-72, 74. G.B. also did not remember whether her mother was away in Michigan on the date of the incident. Tr. 73. She further affirmed that she did not "have any memory of November 4, 2008[.]" Tr. 71.

{¶107} Because she was not able to recall the circumstances or events of November 4, 2008, G.B.'s testimony does not provide a basis to challenge the

evidence from trial that establishes that Tebelman was alone with G.B. for several hours before she disclosed the allegations of sexual abuse to her grandmother. Tebelman also does not identify any evidence on appeal that establishes that the hours G.B. spent alone with him on November 4, 2008 were not the timeframe in which she suffered the lacerations that were discovered in her body.

{¶108} Further, in this assignment of error, Tebelman points to the fact that other people had contact with G.B. in the days preceding her disclosure on November 4, 2008.[4] He appears to be suggesting that someone else may have caused the injuries to G.B.'s vagina and anus in this timeframe. However, in her testimony at the December 2021 hearing, G.B. indicated that she believed that the injuries observed on her body in 2008 were caused by constipation or a urinary tract infection. Thus, G.B.'s testimony at the December 2021 hearing does not fit with the argument that is raised by Tebelman in this assignment of error.

{¶109} In conclusion, Tebelman relies exclusively upon the testimony presented at his trial to make this argument in his brief because he cannot rely on the content of G.B.'s testimony at the December 2021 hearing to challenge the

---

[4] Of significance to this trial is the fact that Tebelman was alone with G.B. in the timeframe preceding the discovery of her injuries and the disclosure of her allegations. In his brief, Tebelman does not identify any facts or evidence that would suggest these other individuals had the opportunity to sexually abuse G.B. during the points of contact that each of them had with G.B. in between November 2, 2008 and November 4, 2008 or that G.B. manifested signs of having suffered injuries immediately after interacting with any of these other individuals.

timeline that was established at trial.[5] While Tebelman identified G.B.'s testimony as the newly discovered evidence that was the basis of his motion for a new trial, her testimony does not dispute the evidence presented at trial or conflict with the factual interpretation that is contested in this assignment of error.[6] Thus, this argument does not identify any newly discovered evidence that would provide the trial court with a basis to grant his motion for a new trial in this assignment of error. Given this reality, Tebelman has not explained how this argument demonstrates that the trial court erred by denying a motion for new trial that was based upon G.B.'s testimony at the December 2021 hearing. Because he has not demonstrated that the trial court abused its discretion in denying his motion for a new trial with these arguments, his eighth assignment of error is overruled.

*Ninth Assignment of Error*

{¶110} Tebelman argues that the trial court erred by giving more weight to G.B.'s testimony as a child than to her testimony as an adult.

Legal Standard

{¶111} We herein reincorporate the legal standard for purported recantations as set forth under the fourth assignment of error.

---

[5] In his eighth assignment of error, Tebelman cites to the transcript of the December 2021 hearing on only one occasion. This citation identifies the portion of G.B.'s testimony where she indicated that she had no recollection of who had been with her from November 2, 2008 to November 4, 2008. Appellant's Brief, 26, citing Tr. 71.

[6] In its judgment entry, the trial court stated that, "[d]uring the course of this matter the parties have agreed that the defendant's motion for a new trial is premised upon the fact that [G.B.] * * * has recanted her prior trial testimony." Doc. 235.

Legal Analysis

**{¶112}** In this assignment of error, Tebelman argues that the trial court erred by assuming that it was "in a better position to determined what happened to * * * [G.B.'s] body than the * * * [person] who lives in that body * * *." Appellant's Brief, 36. However, the person who lives "in that body" gave two accounts of what had happened to her body. In his motion for a new trial, Tebelman asserted that these two accounts were in conflict. This required a finder of fact to determine which account was to be believed. The trial court was merely deciding which of these two accounts of what happened to G.B.'s body provided a better explanation of the physical evidence that was created by what transpired on November 4, 2008. Thus, the text of Tebelman's assignment of error challenges the trial court for performing the function Tebelman called it to undertake.

**{¶113}** In the body of this assignment of error, Tebelman argues that the trial court erred in "assigning an inordinate amount of weight" to the trial testimony given by G.B. Appellant's Brief, 28. He then raises several arguments to substantiate this claim. In one of these arguments, Tebelman asserts that G.B.'s grandmother's trial testimony was not credible. However, this does not detract from the credibility of G.B.'s trial testimony and does not establish that G.B.'s December 2021 testimony was credible. In the remaining arguments in this assignment of

error, he asserts challenges that were raised in previous assignments of error. Based on these prior analyses, we again find these arguments to be without merit.

{¶114} The record indicates that the trial court considered G.B.'s trial testimony from 2009 and her testimony from 2021 in a lengthy and detailed judgment entry. The trial court compared both sets of testimony to the physical evidence and testimony from other witnesses who testified at trial in 2009. The trial court found that G.B.'s trial testimony from 2009 was more consistent with the extensive physical and testimonial evidence produced at trial and was, therefore, more credible than the testimony from the December 2021 hearing.

{¶115} In conclusion, the trial court, as the finder of fact, was "free to believe all, part, or none of [a] * * * witness's testimony" and concluded that G.B.'s testimony at the December 2021 hearing did not offer a credible explanation of the medical evidence that was created by what transpired on November 4, 2008. *Meek, supra*, at ¶ 28. Again, this conclusion does not suggest that G.B.'s testimony did not represent a sincere and honest effort to convey what she could recall of the traumatic events that occurred to her as a very young girl. However, at the December 2021 hearing, her memory showed signs of having been weakened by the passage of over thirteen years.

{¶116} In the end, G.B.'s trial testimony provided a more credible explanation of the significant injuries that she had sustained and was more

consistent with Tebelman's own statements at trial than the testimony that was offered at the December 2021 hearing. G.B.'s testimony at the December 2021 hearing simply cannot explain the significant injuries that she had sustained on November 4, 2008. Because the arguments raised in this appeal do not establish that the trial court abused its discretion in denying his motion for new trial, Tebelman's ninth assignment of error is overruled.

*Conclusion*

{¶117} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Putnam County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**MILLER and ZIMMERMAN, J.J., concur.**

**/jlr**